**No. 2016-1881**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

ENZO BIOCHEM, INC., ENZO LIFE SCIENCES, INC., and YALE UNIVERSITY,

Plaintiffs-Appellants,

v.

APPLERA CORP. and TROPIX, INC.

Defendants-Appellees,

# CORRECTED BRIEF OF PLAINTIFFS-APPELLANTS

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT IN CASE NO: 3:04-CV-929, JUDGE JANET BOND ARTERTON.**

**BAKER BOTTS L.L.P.**
L. Gene Spears
(Principal Attorney)
Michael Hawes
One Shell Plaza
910 Louisiana
Houston, Texas 77002
713.229.1234
713.229.1522 (Facsimile)
E-mail gene.spears@bakerbotts.com
Attorneys for Appellants

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Enzo Biochem, Inc. **v.** Applera Corp.

Case No. 16-1881

## CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Enzo Biochem, Inc., Enzo Life Sciences, Inc. and Yale University

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Enzo Biochem, Inc. | Enzo Biochem, Inc. | None |
| Enzo Life Sciences, Inc. | Enzo Life Sciences Inc. | None |
| Yale University | Yale University | None |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Baker Botts L.L.P.: L. Gene Spears, Michael A. Hawes, Robert Riddle (no longer with Baker Botts) - see attachment

July 1, 2016
Date

/s/ L. Gene Spears
Signature of counsel

Please Note: All questions must be answered

L. Gene Spears
Printed name of counsel

cc: All Counsel of Record

Reset Fields

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Enzo Biochem Inc. v. Applera Corp

No. 16-1881

**CERTIFICATE OF INTEREST**

**Continued from main page:**

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

**Susman Godfrey**: Stephen D. Susman;
**Donhue, Durham & Noonan**: Patrick M. Noonan
**Zeldes, Needle & Cooper, P.C.:** Edward R. Scofield, Kristen L. Zaehringer, Marie A. Casper

**Hunton & Williams:** David A. Kelly, Emerson V. Briggs,III, Esther H. Setinhauer, Gregory N. Stillman, Jennfier albert, Scott Robertson, Patrick A. Doody.

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....... 1

JURISDICTIONAL STATEMENT ....... 1

STATEMENT OF THE ISSUES ....... 2

STATEMENT OF THE CASE ....... 2
- A. Proceedings Through the First Appeal ....... 2
- B. Proceedings Through the Second Appeal ....... 5
- C. Proceedings on Remand from the Second Appeal ....... 10

STATEMENT OF FACTS ....... 12
- A. DNA, RNA, Hybridization and Labeling ....... 12
- B. The Claims at Issue ....... 13
- C. Fluorescent Labeling in the Accused Products ....... 14
- D. Amplification and the Indirect Detection of Labeled Nucleotides ....... 15
- E. DNA Sequencing ....... 18
- F. Signal Amplification in the Accused Products ....... 19

SUMMARY OF THE ARGUMENT ....... 20

ARGUMENT ....... 22

I. Standard of Review ....... 22

II. Claims 1 and 8: The District Court Erroneously Decided Disputed Fact Issues on Equivalence ....... 22
- A. The District Court Addressed Substance on a Procedural Motion ....... 23
- B. Enzo Has Raised Disputed Fact Issues On Equivalence ....... 25
- C. The District Court Inferred Facts in ABI's Favor ....... 27

III. Claims 67, 68 and 70: The District Court Erroneously Construed This Court's Mandate as Imposing a Construction Contrary to its Precedent ....... 30
- A. Background Relevant to this Court's Mandate ....... 31
  - 1. The Independence of Dependent Patent Claims ....... 31
  - 2. Improper Dependence and *Pfizer v. Ranbaxy* ....... 33
- B. This Court Did Not Instruct the District Court to Err ....... 36

C. The January 16, 2014 Judgment Should be Reinstated .............................38
1. Infringement Should Not Be Retried .................................................39
2. ABI Has Waived Any Defense of Invalidity .....................................40
3. Damages Need not be Retried............................................................41

CONCLUSION ...........................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp.*,
294 U.S. 477 (1036)....................................................................................32

*Brilliant Instruments, Inc. v. Guidetech, LLC*,
707 F.3d 1342 (Fed. Cir. 2013) ......................................................................26

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
576 F.3d 1358 (Fed. Cir. 2009) (*en banc*) ..............................................22, 41

*Cardinal Chemical Co. v. Morton Int'l, Inc.*,
508 U.S. 83 (1993)..........................................................................................40

*Charles Machine Works, Inc. v. Vermeer Mfg. Co.*,
723 F.3d 1376 (Fed. Cir. 2013) ......................................................................27

*Cook v. Rockwell Int'l Corp.*,
790 F.3d 1088 (10th Cir. 2010) ................................................................39, 40

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
438 F.3d 1374 (Fed. Cir. 2006) ......................................................................33

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
469 F.3d 1005 (Fed. Cir. 2006) ................................................................27, 29

*Enzo Biochem, Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010) .......................................... 1, 2, 5, 13, 14, 16, 37

*Enzo Biochem, Inc. v. Applera Corp.*,
780 F.3d 1149 (Fed. Cir. 2015) ....................................... 1, 9, 12, 16, 19, 36, 38

*Enzo Biochem v. Applera*,
No. 2008-1058 (Fed. Cir. Jan. 30, 2008).......................................................1, 4

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
149 F.3d 1309 (Fed. Cir. 1998) ................................................................22, 23

*Ex parte Brown*,
1917 C.D. 22 (Comm'r Pat. 1917) ..................................................................31

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,
137 F.3d 147 (Fed. Cir. 1998) ....................24

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,
137 F.3d 1475 (Fed. Cir. 1998) ....................11, 24

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
370 F.3d 1131 (Fed. Cir. 2004) ....................31

*IMS Technology, Inc. v. Haas Automation, Inc.*,
206 F.3d 1422 (Fed. Cir. 2000) ....................22

*In re Enzo Biochem*,
No. 2009-M892 (Fed. Cir. Feb. 6, 2009)....................5

*In re Sexton*,
1873 C.D. 66 (Comm'r Pat. 1973) ....................31

*Kraft Foods, Inc. v. Int'l Trading Co.*,
203 F.3d 1362 (Fed. Cir. 2000) ....................29

*Lazare Kaplan Int'l, Inc. v. Photoscribe Technologies, Inc.*,
714 F.3d 1289 (Fed. Cir. 2013) ....................41

*Legett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
285 F.3d 1353 (Fed. Cir. 2002) ....................25, 27

*Odetics, Inc., v. Storage Technology Corp.*,
185 F.3d 1259 (Fed. Cir. 1999) ....................41

*Overhead Door Corp. v. Chamberlain Group, Inc.*,
194 F.3d 1261 (Fed. Cir. 1999) ....................25, 26, 27

*Pall Corp. v. Micron Separations, Inc.*,
66 F.3d 1211 (Fed. Cir. 1995) ....................32

*Pfizer, Inc. v. Ranbaxy Laboratories, Inc.*,
405 F.Supp. 495 (D. Del. 2005)....................34, 35

*Pfizer, Inc. v. Ranbaxy Laboratories, Ltd.*,
457 F.3d 1284 (Fed. Cir. 2006) .................... 10, 21, 31, 33, 35, 36, 37, 38

*Ring & Pinion Service, Inc. v. ARB Corp., Ltd*,
743 F.3d 831 (Fed. Cir. 2014) ....................28

*Spectrum Pharma, Inc. v. Sandoz, Inc.*,
3024 WL6865692 at *22 (D. Nev., Dec. 31, 2013) ..........................................33

*TiVo, Inc. v. Echostar Communications*,
516 F.3d 1290 (Fed. Cir. 2008) ..............................................................10, 41, 42

*Toro Co. v. White Consolidated Indus., Inc.*,
266 F.3d 1367 (Fed. Cir. 2001) ........................................................................25

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17, 117 S.Ct. 1040 (1997)...................................................................23

## STATEMENT OF RELATED CASES

This is the third appeal in this matter. This Court's decisions in the two prior appeals are reported at *Enzo Biochem, Inc. v. Applera Corp*., 599 F.3d 1325 (Fed. Cir. 2010) and *Enzo Biochem, Inc. v. Applera Corp*., 780 F.3d 1149 (Fed. Cir. 2015).

United States Patent No. 5,449,767 ('767 Patent), the sole patent remaining in this lawsuit, has been asserted in seven cases filed in the United States District Court for the Southern District of New York: *Enzo Biochem, Inc. v. Amersham PLC*, 1:02-cv-08448-RJS; *Enzo Biochem, Inc. v. Molecular Probes*, 1:03-cv-03816-RJS; *Enzo Biochem, Inc. v. PerkinElmer, Inc*., 1:03-cv-03817-RJS; *Enzo Biochem, Inc. v. Orchid Biosciences*, 1:03-cv-03819-RJS; *Enzo Biochem, Inc. v. Sigma-Aldrich Corp*., 1:03-cv-03820-JES; *Roche Diagnostics GMBH v. Enzo Biochem, Inc*., 1:04-cv-04046-RJS; and *Affymetrix, Inc. v. Enzo Biochem, Inc., et al*, 1:03-cv-08907. Except for the *Roche Diagn*ostics matter, each of these cases has concluded.

## JURISDICTIONAL STATEMENT

The district court's jurisdiction is established by 28 U.S.C. § 1331 and § 1338(a), (b). A final judgment closing the case was entered on February 23, 2016. Appx0001. Enzo timely filed its notice of appeal on March 14, 2016. Appx0883. This Court's jurisdiction is established by 28 U.S.C. § 1295(a).

## STATEMENT OF THE ISSUES

1. Whether the declaration of Enzo's expert attesting to the insubstantiality of differences between the accused products and the inventions of claims 1 and 8 of the '767 Patent -- a declaration not countered by ABI -- raises disputed issues of material fact precluding entry of summary judgment that those claims are not infringed under the doctrine of equivalents.

2. Whether the district erred in applying this Court's mandate, *see Enzo Biochem, Inc., v. Applera Corp.*, 599 F.3d 1325 (Fed. Cir. 2015), to hold that claims 67, 68 and 70 are not literally infringed by subject matter they expressly define.

## STATEMENT OF THE CASE

While the issues presented in this appeal are narrow and focused, its procedural history is anything but.

### A. Proceedings Through the First Appeal

In a complaint filed June 7, 2004, Enzo Biochem, Inc., Enzo Life Sciences, Inc., and Yale University (collectively, "Enzo") sued Applera Corp. and Tropix, Inc. (collectively, "ABI") for infringement of six patents -- United States Patents Nos. 5,476,928 ('928 Patent); 5,449,767 ('767 Patent); 5,328,824 ('824 Patent), 4,711,955 ('955 Patent); 5,082,830 ('830 Patent), and 4,994,373 ('373 Patent). In an answer filed July 29, 2004, ABI counterclaimed for declaratory judgment that all six patents are invalid and not infringed.

On October 13, 2006, the district court issued an order construing disputed terms for all six patents. Appx0145. The first issue addressed in that order is whether the signaling moiety, "A," as claimed in the '824 and '767 Patents, could be detected directly or whether "A" must be detected indirectly, e.g., by reacting or complexing it with something else. Upon finding "that A may be a part of or the entire signaling moiety," the district court "decline[d] to limit Claim 1 only to indirect detection, and adopt[ed] plaintiffs' construction of the disputed Claim 1 language in the '824 and '767 patents." Appx0153.

Recognizing that infringement of the '830 and '373 Patents could not be proven under the district court's construction of different claim language, Enzo withdrew its claim for infringement. On August 23, 2007, the district court entered a stipulated partial judgment dismissing all claims and counterclaims relating to those patents. As to the '955 Patent, Enzo indicated it would not press a claim for infringement, either, though a formal stipulation to this effect was executed much later, in May of 2008.

Following fact and expert discovery, cross-motions for summary judgment directed to infringement of the '767, '824 and '928 Patents, as well as defense motions challenging their enforceability (on grounds of laches and estoppel) and validity (on multiple grounds), were filed. On September 6, 2007, the district court entered an order finding that:

- Enzo had raised a disputed issue of fact as to whether the asserted claims of the '824 and '767 Patents satisfy the written description requirement of the patent statute, more specifically, as to whether those patents disclose direct detection of a signaling moiety, "A" (Appx0194);
- Enzo had raised a disputed issue of fact as to whether the '824 and '767 Patents enable the use of directly detectable fluorescent labels (Appx0200);
- the asserted claims of all three patent were invalid for indefiniteness, because language providing that a "linkage group" not "interfer[e] substantially" with nucleic acid hybridization or detection of "A" was insufficiently precise (Appx0212);
- the asserted claims of the '824 and '767 patents were anticipated by a first prior art reference (Kasai); the asserted claims of the '767 patent were anticipated by a second prior art reference (Pingoud); the asserted claims of the '928 patent were anticipated by a third reference (Bauman) (Appx0218-20, Appx0221-23, Appx0228).

The district court entered judgment on these findings, which Enzo appealed. *Enzo Biochem v. Applera*, No. 2008-1058 (Fed. Cir. Jan. 30, 2008). Upon recognizing that the district court's judgment was not final due to pending declaratory judgment counterclaims levied against the '955 Patent, Enzo voluntarily moved to dismiss its appeal. After executing a stipulated dismissal of

claims and counterclaims relating to the '955 Patent, Enzo moved the district court for entry of a final, appealable judgment, which motion that court denied. Enzo then petitioned this Court for a writ of mandamus directing the district court to reopen the case, dismiss ABI's counterclaims relating to the '955 Patent and enter final judgment.

This Court granted Enzo's petition, *see In re Enzo Biochem*, No. 2009-M892 (Fed. Cir. Feb. 6, 2009), and the district court entered a final judgment, which Enzo appealed. In a decision handed down March 26, 2010, this Court (1) reversed the district court's judgment that the '767, '824 and '928 Patents are invalid for indefiniteness, (2) vacated its judgment that the '767 and '824 Patents are invalid as anticipated and (3) affirmed its judgment that the '928 Patent is invalid as anticipated. *Enzo Biochem, Inc., v. Applera Corp.*, 599 F.3d 1325 (Fed. Cir. 2010).

### B. Proceedings Through the Second Appeal

To facilitate trial, Enzo waived its claims for infringement of the '824 Patent and limited its assertion of the '767 Patent to claims 1, 8, 67, 68 and 70. Following a seven-day trial, a jury returned a verdict finding that the manufacture and sale of the accused ABI BigDye and dRhodamine dye-terminator products directly infringed and that the sale of DNA sequencing instruments induced customers to infringe each of claims 1, 8, 67, 68 and 70. The jury found that ABI had failed to

prove with clear and convincing evidence that any of these claims were invalid as anticipated or obvious, as unsupported by the patent's written description or for a failure of enablement. It made two advisory findings relevant to ABI's equitable defenses, i.e., that Enzo had not unreasonably delayed in filing suit and that ABI was not materially prejudiced by such delay. The jury awarded $48,587,500 as a reasonable royalty for ABI's direct infringement and no damages for inducement of infringement. Appx0230.

Enzo requested a new trial limited to damages for ABI's inducement of infringement via sale of DNA sequencing instruments. ABI moved for judgment as a matter of law on infringement and on all of its invalidity defenses. ABI also requested judgment in its favor based on its equitable defenses of laches and estoppel. Appx0230. On August 1, 2013, the district court entered an order that (1) denied Enzo's motion for new trial, (2) denied ABI's motion for judgment as a matter of law and (3) found ABI had failed to prove its defenses of laches and estoppel. Enzo moved for an award of pre- and post-judgment interest, which motion was granted on January 16, 2014, along with entry of a final judgment, which ABI appealed. Appx0281.

ABI presented this Court with assertions of error focused on the district court's construction of "A," i.e., that "A comprises at least three carbon atoms and is one or more parts of a signaling moiety, which includes, in some instances, the

whole signaling moiety." ABI framed the first (and main issue) on appeal as "[w]hether the finding of infringement should be reversed because, contrary to the district court's claim construction, the '767 patent does not cover the directly detectable terminator nucleotides of the accused product." Appx0317. ABI then proceeded to argue why, in its view, *claim 1* does not cover such nucleotides. While setting out the full text of *that* claim, ABI's Statement of the Case does not quote any of claims 67, 68 or 70, noting only that these claims "were not added to the '767 patent application until December of 1994." Appx0319-21. When ABI set forth its legal argument for limiting the '767 patent to indirect detection, it focused solely on language in claim 1. Appx0323-25.

Dependent claims 67, 68 and 70 figured prominently in the district court's construction of claim 1. Upon finding that these claims (along with three others from the '824 Patent) "teach[] direct detection," that court applied a rule, well-grounded in this Court's precedent, that the independent claims (such as claim 1 of the '767 Patent) are not limited to indirect detection. Appx0151-52. ABI did not take issue with this factual predicate, i.e., that claims 67, 68 and 70 read on directly-detectable A. When pressed at oral argument, ABI's counsel even conceded that its proposed construction of independent claim 1, if imposed on the dependent claims, would deprive claims 67 and 68 of substantial scope and afford

claim 70 no scope at all. Federal Circuit Oral Argument at 5:20-45, available at http://oral arguments.cafc.uscourts.gov/default aspx?fl=2014-1321.mpr.

ABI's position was not that claims 67, 68 and 70 do not cover direct detection on their own express terms but that a "broadly phrased dependent claim cannot expand the scope of a narrow independent claim." Appx0326. In its Reply Brief, ABI asserted that Enzo's (and the district court's) position amounted to an "assertion that dependent claims that were added some twelve years after the original application can dramatically expand the scope of an earlier, narrow independent claim." Appx0331. Without citing any authority, ABI proposed that if the independent claims of the '767 patent are limited to indirect detection, "that limitation carries through to the dependent claim." Appx0326. In the statement of relief it was requesting, ABI proposed that "[b]ecause the accused products are directly detectable nucleotides, this Court should *reverse* the district court's claim construction and the finding of infringement." Appx0322 (emphasis added).

Enzo did not dispute ABI's factual predicate, i.e., that the accused products all employ directly detectable nucleotides. To the contrary, Enzo's counsel conceded in response to specific inquiry from the bench that "the jury found infringement by products in which A is fluorescent and directly detectable." Federal Circuit Oral Argument at 12:12. If this clear admission regarding what was accused of infringement warranted judgment for ABI under whatever claim

construction this Court adopted, it presumably would have directed the district court to enter one. Instead, this Court "reverse[d] the district court's claim construction, vacate[d] the district court's finding of infringement, and remand[ed] to the district court with instruction to determine, consistent with the analysis in this opinion, whether the accused product infringes." *Enzo Biochem, Inc. v. Applera Corp.*, 780 F.3d 1149, 1157 (Fed. Cir. 2015).

That analysis concerned the scope of claim 1, the only claim this Court expressly stated was "limited to direct detection." *Enzo Biochem*, 780 F.3d at 1157. The Court based its construction primarily on the claim's plain language:

> First, the phrase "at least one component of a signaling moiety" indicates that the signaling moiety is composed of multiple parts as the term "component" in and of itself indicates a multipart system. Thus, construing the phrase to allow for a single-component system, as the district court did here, would read out the phrase "component of a signaling moiety" and would thus impermissibly broaden the claim. *Id.*, at 1154.

The Court's opinion twice mentions claims 67, 68 and 70. It places them within the "asserted claims" of the '767 patent, *id.*, at 1050, then recognizes their coverage of direct detection while declining to impute that scope to claim 1:

> The district court found that dependent claims 67, 68 and 70 of the '767 patent involved direct detection and therefore independent claim 1 must not be limited to indirect detection. However, dependent claims cannot broaden an independent claim from which they depend. . . . Thus, as claim 1 is limited to indirect detection by its own plain meaning, it would be inappropriate to use the doctrine of claim differentiation to broaden claim 1 to include a limitation imported from a dependent claim, such as direct detection. *Id.*, at 1156-57.

### C. Proceedings on Remand from the Second Appeal

In compliance with this Court's instruction that it "determine, consistent with the analysis in this opinion, whether the accused product infringes," the district court invited the parties to file cross-motions for summary judgment. Citing *Pfizer, Inc. v. Ranbaxy Laboratories, Ltd.*, 457 F.3d 1284 (Fed. Cir. 2006), Enzo moved for reentry of the judgment of January 16, 2014, based on the jury's verdict that claims 67, 68 and 70 are infringed. Specifically, Enzo argued that under *Pfizer*, when a dependent claim has scope broader than a claim from which it depends, the accused infringer's objection is not to infringement but to validity, a defense waived by ABI and foreclosed by this Court's mandate, which did not, in Enzo's view, impact the scope of claims 67, 68 and 70. Because its damages case did not depend on which of the '767 Patent's asserted claims were infringed, Enzo argued that a new trial on damages was not warranted, citing *TiVo, Inc. v. Echostar Communications*, 516 F.3d 1290, 1304-05 (Fed. Cir. 2008).

In its motion for summary judgment, ABI argued that this Court's findings regarding claim scope applied to all asserted claims of the '767 Patent. Because the accused products all employ indirect detection, they cannot infringe literally. As to infringement under the doctrine of equivalents, ABI did not advance an argument on the merits. Instead, ABI urged that recourse to the doctrine was barred procedurally by Enzo's failure to raise it during discovery, e.g., by offering

opinions in the reports of its experts. Appx0567-70. Although Enzo did not believe a substantive response was warranted, it nonetheless provided one, supporting it with the declaration of its expert, Dr. Richard Sinden. Appx0853-56. After reviewing the patent's disclosure of how indirect detection is used to amplify the signal of nucleotides to be detected, and how the accused BigDye and dRhodamine sequencing kits employ polymerase chain reaction (PCR) enzymes to accomplish the same purpose, Dr. Sinden concluded that:

> In the mid 1980's, a person of ordinary skill in the art of nucleotide analysis and sequencing would have viewed as insubstantial the difference between PCR amplification in the accused products and the use of enzymes attached to avidin to amplify the signal of a biotinylated nucleotide. As to the indirectly-detectable "A" of claim one, the use of PCR to amplify the signal of DNA sequences labeled by the fluorescent dye terminators in the accused products serves the same function (to make the signal detectable by the methodology to be employed), in ways that differ insubstantially (increasing concentration vs. increasing strength), to yield the identical result. (Appx0855-56).

This declaration stands unchallenged by a counter-declaration from ABI's expert.

On February 22, 2016, the district court issued its Ruling on Plaintiffs' Motion for Entry of Judgment and Defendants' Motion for Summary Judgment. Upon finding that "neither party's arguments successfully eliminate all ambiguity from the Federal Circuit's ruling," (Appx0009), the district court agreed with ABI that "the Federal Circuit intended its ruling to construe all of the claims at issue to cover only indirect detection." Appx0010. Citing *Exxon Chemical Patents, Inc. v.*

*Lubrizol Corp.*, 137 F.3d 1475 (Fed. Cir. 1998), the court held Enzo was not barred procedurally from raising the doctrine of equivalents. Appx0011. Nonetheless, the court entered summary judgment that, notwithstanding the expert testimony before it, "[p]laintiffs cannot now claim that indirect and direct detection are insubstantially different, and no jury could so find." Appx0015.

## STATEMENT OF FACTS

As this Court has recognized, this case "involves the use of nucleotide probes that allow a scientist to detect, monitor, localize, or isolate nucleic acids when present in extremely small quantities, as is necessary for the sequencing of deoxyribonucleic acid." *Enzo Biochem*, 780 F.3d at 1150.

### A. DNA, RNA, Hybridization and Labeling

Another prior opinion of this Court provides a useful primer on nucleotides, their hybridization and labeling:

> DNA and RNA are composed of a series of units, called "nucleotides." Each nucleotide is composed of a nitrogenous base, a pentose sugar and a phosphate group. the phosphate group of one nucleotide forms a covalent bond with the pentose sugar of an adjacent nucleotide, thereby linking the nucleotides along a "sugar-phosphate backbone." Aside from linking the nucleotide units into a polynucleotide strand, the sugar-phosphate backbone provides a structural support for the nitrogenous bases. The bases fall into two categories: pyrimidines and purines. Pyrimidines include cytosine ("C"), thymine ("T"), and uracil ("U"). Purines include adenine ("A") and guanine ("G"). DNA contains the bases adenine, thymine, cytosine and guanine; RNA also includes adenine, cytosine, and guanine, but contains the base uracil in place of thymine. Two strands of DNA or RNA having complementary bases will bind, or

> "hybridize," to form a double-stranded complex, or "hybrid," which is held together by hydrogen bonds between complementary bases. In DNA, adenine on one strand binds to thymine on the other; in RNA, adenine binds to uracil; and in both DNA and RNA, cytosine binds to guanine. The process of forming a double-stranded hybrid is called "hybridization." The reverse process, resulting in two separate strands, is called "denaturation."
>
> Because hybridization occurs in a predictable manner between complementary strands, it is possible to detect the presence of a nucleic acid of interest in a sample. For example, a chemical entity, called a "label," can be attached to or incorporated into a nucleic acid strand of a known sequence, called a "probe," which will hybridize with a complementary sequence of interest, called a "target." Once the probe is hybridized with the target, a detectable signal is generated either from the label itself (referred to as "direct detection") or from a secondary chemical agent that is bound to the label (referred to as "indirect detection"). If a signal is detected from the sample after all unhybridzed probes have been removed, detection of the signal implies the presence of a target in that sample.
>
> Labeling of nucleic acids has been accomplished using a variety of chemical entities. For example, with radioactive labels, an isotope of hydrogen (3H), phosphorous (32P), or carbon (14C) is substituted for a non-radioactive atom within the probe, and the isotope is then detected using a radiation detector. But radioactive labels have drawbacks. As explained in the . . . '767 . . . patent, radioactive labels are "potentially hazardous," "expensive to purchase and use," and "often very unstable."

*Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1328 (Fed. Cir. 2010).

### B. The Claims at Issue

Claim 1 of the '767 patent is to "[a]n oligo- or polynucleotide containing a nucleotide having" the following structure:




The component attached to the right side of that structure, "A," is defined to "comprise[] at least three carbon atoms and represents at least one component of a signaling moiety capable of producing a detectable signal." Appx0139. Claims 8 and 67 depend on claim 1; claim 68 depends on claim 67; claim 70 depends on claim 68. In claim 8, the "linkage group" that attaches the signaling moiety "A" to the base "B" "includes the moiety -$CH_2$-NH-." Appx0140.

In claim 67, "A" is not a portion or component of an indicator molecule, as this Court construed the "A" of claim 1. Instead, the "A" of claim 67 "comprises an indicator molecule." Appx0142. In claim 68, this "indicator molecule" is "fluorescent, electron dense, or is an enzyme capable of depositing insoluble reaction products." *Id.* In claim 70, this indicator molecule is fluorescent and "selected from the group consisting of fluorescein and rhodamine." *Id.*

### C. Fluorescent Labeling in the Accused Products

During the 2013 trial, the jury heard evidence from Enzo's expert (Dr. Richard Sinden) that the accused dRhodamine products include rhodamine and that the accused BigDye products include rhodamine and fluorescein, which are fluorescent and indicators and thereby satisfy "A" as defined in each of claims 67,

68 and 70. (Appx902-03). At no point in these proceedings -- whether at trial through its expert, on motion to the district court or on appeal to this Court -- has ABI disputed this. ABI has never questioned that in both accused product lines there is an indicator molecule (meeting "A" per claim 67) that is fluorescent (meeting "A" per claim 68) and comprises rhodamine or rhodamine in combination with fluorescein (meeting "A" per claim 70).

### D. Amplification and the Indirect Detection of Labeled Nucleotides

What is not addressed in either of this Court's prior opinions on the merits is the purpose served by detecting these labels indirectly. The '767 Patent identifies as "preferred A moieties" biotin:




and iminobiotin:




Appx0128 (8:44-45).

These compounds can be detected directly by a variety of analytical techniques including infrared and nuclear magnetic resonance spectroscopy. But

these techniques may not be (and indeed are not) sufficiently sensitive to detect, e.g., biotin-labeled nucleotides "when present in extremely small quantities, as is necessary for the sequencing of deoxyribonucleic acid." *See Enzo Biochem*, 780 F.3d at 1150. The "detectable signal [] generated [] from the label itself," *Enzo Biochem*, 599 F.3d at 1328, is too weak. So instead of detecting these labels directly, the '767 Patent teaches that "biotin and iminobiotin strongly interact with avidin, a 68,000 dalton glycoprotein from egg white." Appx0125 (1:57-58). The patent goes on to explain how this facilitates detection:

> If avidin is coupled to potentially demonstrable indicator molecules, including fluorescent dyes, e.g. fluorescein or rhodamine; electron-dense reagents, e.g., ferritin, hemocyanin, or colloidal gold; or enzymes capable of depositing insoluble reaction products, e.g. peroxidase or alkaline phosphatase, the presence, location, or quantity of a biotin probe can be established. Appx0125 (1:61-67).

At column 19, the patent provides the following schematic illustrating the use of avidin coupled with a peroxidase (i.e., an "enzymes capable of depositing insoluble reaction products") to detect a biotinized nucleotide:




Appx0134 (19:24-58). Here, the '767 Patent identifies the purpose or function of indirectly detecting a label by reacting it with something else. That purpose is "signal amplification." While the infrared, nmr or other signals from biotin may be too weak to detect "when present in extremely small quantities," that signal may be amplified to a level capable of detection by, e.g., reacting biotin with avidin coupled to a peroxidase.

As Enzo's expert, Dr. Sinden, explained "[a]n important feature of the '767 patent is application of signaling moieties that can effectively amplify the signal."

Appx0854, ¶ 4. He cited the patent's multiple "[r]eferences to signal amplification and an increase in signal to noise ratios for purposes of increasing detection." *See, e.g.*, Appx0126, Appx0133-3, Appx0135-36 (3:11-13; 18:8-15; 18:61-64; 19:25-58 (figure); 21:10-19; 22:23-30; 22:47-54; 23:52-60; 24:11-13; 24:23-29). He identified indirect detection as one of the signal-amplification techniques described in the patent, "i.e., reacting the 'A' of claim one with something that amplifies a signal, yielding a stronger signal." Appx0854, ¶ 5. He explained how this works in connection with several of the detection schemes disclosed in the patent:

> The deposition of an insoluble signal (chromophore or electron dense reagent) is "amplified" by enzymatic activity, for example by peroxidase, in that multiple detectable signals are generated by a single signaling moiety. Enzymes catalyze reactions converting substrates into products with a characteristic turnover number. Catalytic reactions are basically a form of substrate to product amplification. The '767 patent discusses this mode of amplification in producing a detectable signal. Appx0855, ¶ 5.

### E. DNA Sequencing

As this Court explained in its most recent opinion in this matter:

> DNA sequencing relies on the aforementioned principles, except with the goal of determining the order of base pairs in an unknown DNA sequence rather than determining whether a known DNA sequence is present. Until recently, the predominant method of DNA sequencing, and the method relevant to this case, was the Sanger method. The Sanger method requires that a sample of the DNA strand to be sequenced by placed in a solution that includes nucleotides, a primer (short piece of DNA), and a polymerase enzyme. Once combined, the primer hybridizes to a portion of the unknown DNA sequence. Then, starting at the primer, the polymerase enzyme attaches individual

> complementary nucleotides and covalently attaches them to the proceeding nucleotide in the strand.
>
> The key to the Sanger method is that a small portion of the nucleotides added to solution are special nucleotides, capable of preventing the polymerase enzyme from adding any additional nucleotides to the DNA strand. These special nucleotides are called dideoxyterminators. The incorporation of the dideoxyterminators is random, and thus allows for the synthesized DNA strands to be of varying lengths. The newly synthesized complementary strands are then sorted from shortest to longest. One then identifies the dideoxyterminators for each strand length. By knowing strand length and the strand's dideoxyterminator, one can determine the nucleotide sequence of the unknown DNA strand.
>
> Just as with DNA probes, dideoxyterminators are detected either by direct or indirect detection. And just as when using DNA probes, detecting dideoxyterminators through direct detection, i.e., with radioactive isotopes, is potentially hazardous and expensive. To avoid these drawbacks, nucleotide probes that do not rely on traditional radioactive labels were developed. The '767 patent is directed toward these new nucleotide probes.

*Enzo Biochem*, 780 F.3d at 1151-52.

### F. Signal Amplification in the Accused Products

As noted in section C, *supra*, the accused BigDye and dRhodamine sequencing kits include dideoxyterminators with fluorescent labels. But they also include polymerase chain reaction (PCR) enzymes. Those enzymes serve a function identical to that of the indirect detection schemes disclosed in the '767 Patent. They amplify the signal. As Dr. Sinden explained:

> Much like the patent's proposed addition of enzymes linked to avidin to amplify the signal of a biotinylated nucloeitde, the accused products also employ materials extraneous to the labeled nucleotides

> to amplify their signal yield. All of the accused BigDye and dRhodamine kits include polymerase chain reaction (PCR) enzymes. These enzymes catalytically amplify the fluorescent signal from DNA sequences labeled with the dye terminators by increasing the concentration of those labeled sequences (thereby increasing both sequences and labels). This is not substantially different from the avidin-peroxidase enzyme linked system that catalytically amplifies a product generating a detectable signal. Amplification by PCR works by increasing the concentration of molecules producing the signal (amplifying product from substrates) rather than increasing the signal strength for an individual molecule.
>
> In the mid 1980's, a person of ordinary skill in the art of nucleotide analysis and sequencing would have viewed as insubstantial the difference between PCR amplification in the accused products and the use of enzymes attached to avidin to amplify the signal of a biotinylated nucleotide. As to the indirectly-detectable "A" of claim one, the use of PCR to amplify the signal of DNA sequences labeled by the fluorescent dye terminators in the accused products serves the same function (to make the signal detectable by the methodology to be employed), in ways that differ insubstantially (increasing concentration vs. increasing strength), to yield the identical result. Appx0855-56, ¶¶6-7.

## SUMMARY OF THE ARGUMENT

From the evidence provided in Dr. Sinden's declaration, a reasonable jury could find that the accused products are infringing equivalents of the invention defined in claims 1 and 8 of the '767 Patent. Per this Court's construction, "A" in those claims is detected indirectly. The purpose of this indirect detection, as stated in the patent, is to amplify the detectable signal. The accused DNA sequencing kits employ PCR enzymes to perform the very same function. Dr. Sinden's testimony that these enzymes differ insubstantially from the indirect detection

disclosed in the patent, that they perform the same function in substantially the same way to yield the same result, was not opposed with counter-testimony from ABI's technical expert, but with attorney argument. In the course of crediting that attorney argument, the district systematically and improperly drew factual inferences in ABI's favor. The district court's summary judgment should be vacated and this matter remanded so that a jury can decide if claims 1 and 8 are infringed under the doctrine of equivalents.

However, such a trial is not needed in view of the admitted scope of claims 67, 68 and 70 and ABI's waiver of invalidity defenses for those claims. As a matter of undisputed fact, the accused products include a signaling moiety, "A", which is an "indicator molecule" (per claim 67), "fluorescent" (per claim 68) and "selected from the group consisting of fluorescein and rhodamine" (per claim 70). The district court arrived at a different conclusion by construing this Court's mandate to impose a construction on these dependent claims that runs counter to this Court's precedent. Consistent with the general principal that the claims of a patent define separate property rights, this Court has recognized that in certain cases, a dependent claim can have a scope entirely outside of the claim from which it depends. *See Pfizer, Inc., v. Ranbaxy Laboratories, Ltd.*, 457 F.3d 1284 (Fed. Cir. 2006). When that happens (as here), the accused infringer's objection is not to infringement of the claim, but to the claim's validity, a position ABI has waived.

If claims 67, 68 and 70 are afforded their proper scope, there are no issues left for trial. This case should be remanded with instruction that the district court re-enter its judgment of January 16, 2014, but only as to claims 67, 68 and 70.

## ARGUMENT

### I. Standard of Review

When reviewing a district court's grant of summary judgment, this Court "make[s] an independent determination as to whether the standards for summary judgment have been met." *IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000). Viewing the evidence in a light most favorable to the non-movant, this Court draws all reasonable inferences in its favor. *Id.* "Summary judgment is appropriate when no reasonable jury could return a verdict for the non-moving party." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998). As to claims 67, 68 and 70, the district court's grant of summary judgment was based on an interpretation of this Court's mandate. This, too, is reviewed *de novo*. *See Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 576 F.3d 1358, 1355 (Fed. Cir. 2009) (*en banc*).

### II. Claims 1 and 8: The District Court Erroneously Decided Disputed Fact Issues on Equivalence

Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused

product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1045 (1997). "Infringement may be found under the doctrine of equivalents if every limitation of the asserted claim, or its 'equivalent,' is found in the accused subject matter, where an 'equivalent' differs from the claimed invention only insubstantially." *Ethicon*, 149 F.3d at 1315. "Whether a component in the accused subject matter performs substantially the same function as the claimed invention in substantially the same way to achieve substantially the same result may be relevant to this determination." *Id*.

### A. The District Court Addressed Substance on a Procedural Motion

A summary judgment movant must "show[] that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ACI attempted this, they did not address insubstantiality, the function/way/result test or any other technical measure of equivalence. They did not identify prior art, prosecution history estoppel or any other substantive bar to a doctrine of equivalence theory. They did not point to anything in the '767 Patent specification that is in any way inconsistent with the accused products being an infringing equivalent of the patented invention, as defined in asserted claims 1 and 8. Instead, ACI's objections were purely procedural, i.e., that Enzo had

waived any position that the signaling moieties in the accused products were equivalent to the claimed "A" by failing to develop them through discovery.

Enzo's answer was that it had no reason to do this, that discovery (at least expert discovery) was conducted and the case was tried under a broad construction of "A," one in which the accused products literally infringed. A similar situation was presented in *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 147, 1478 (Fed. Cir. 1998), in which this Court recognized that "Exxon could not realistically be expected to request alternative jury instructions asking for an advisory verdict on whether the patent would be infringed under the doctrine of equivalents on Lubrizol's proposed claim construction." Citing *Exxon*, the district court likewise found that Enzo was not obligated to develop alternative infringement theories under the construction of "A" that ABI had proposed and that the court had rejected. Appx0011. Having disposed of the sole basis on which ABI had requested summary judgment, the district court should have ended its analysis. And if Enzo had elected not to submit an expert declaration in opposition, presumably that analysis would have ended and the district court would have denied ABI's motion, at least as to the doctrine of equivalents.

But by submitting that declaration, Enzo exposed its expert to attack on the technical merits -- not from ABI's expert, who submitted no counter-declaration -- but from ABI's attorneys, whose arguments on the merits of Enzo's equivalence

theory were largely adopted by the district court. In the course of so doing, that court misconstrued the substance of Dr. Sinden's opinion and drew in ABI's favor multiple inferences regarding the patented technology and accused products.

### B. Enzo Has Raised Disputed Fact Issues On Equivalence

The issue of equivalence is reserved for the finder of fact. *See Overhead Door Corp. v. Chamberlain Group, Inc.*, 194 F.3d 1261, 1269 (Fed. Cir. 1999). This Court has even described infringement inquiries under the doctrine of equivalence as "intensely factual," *see Toro Co. v. White Consolidated Indus., Inc.*, 266 F.3d 1367, 1369 (Fed. Cir. 2001); *Legett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1357 (Fed. Cir. 2002), so that "a summary conclusion that reasonable jury could not find infringement is often illusive." *Legett & Platt*, 285 F.3d at 1360. *See also Toro Co.*, 266 F.3d at 1370 ("this court will only affirm the district court's grant of summary judgment if the record contains no genuine issue of material fact and leaves no room for a reasonable jury to find equivalence.")

Enzo's expert has afforded a reasonable jury ample room to find equivalence. He looked to the '767 Patent to identify the function associated with the indirectly detected labels. This analysis is entirely proper. *See Toro Co.*, 266 F.3d at 1371 (citing the "primary function or objective of the cover, as described in the specification and recited in claim 16"); *Overhead Door*, 194 F.3d at 1270 ("The claim language and the specification explain that the 'memory selection

switch' functions to select memory locations."). As clearly stated, e.g., in the figure found in column 19, the function of the indirectly detected labels is to amplify the provided signal.

Dr. Sinden then looked to the accused sequencing kits to analyze that function and the corresponding way and result. He found the very same function performed by PCR enzymes, which like the avidin-linked enzymes exemplified in the patent, are "extraneous to the labeled nucleotide" and "amplify their signal yield." Appx0855, ¶ 6. Although "[a]mplification by PCR works by increasing the concentration of molecules producing the signal . . . rather than increasing the signal strength for an individual molecule," *id.*, Dr. Sinden concluded such differences are insubstantial, i.e., that these PCR enzymes and the detectable "A" of claim one "serve[] the same function (to make the signal detectable by the methodology to be employed), in ways that differ insubstantially (increasing concentration vs. increasing strength), to yield the identical result (a detectable signal)." Appx0855-56, ¶ 7.

In the face of Dr. Sinden's reasoned and reasonable function/way/result comparison of the accused products with the invention of claim 1, the district court erred in summarily finding claims 1 and 8 not infringed under the doctrine of equivalents. *See Brilliant Instruments, Inc. v. Guidetech, LLC*, 707 F.3d 1342, 1348 (Fed. Cir. 2013) (expert's function/way/result analysis "created a genuine

issue of material fact which precludes summary judgment of noninfringement under the doctrine of equivalents"). *See also Charles Machine Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1380 (Fed. Cir. 2013); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1019 (Fed. Cir. 2006); *Leggett & Platt*, 285 F.3d at 1359; *Overhead Door*, 194 F.3d at 1279.

### C. The District Court Inferred Facts in ABI's Favor

The district court's opinion is, in effect, a critique of the technical merits of Dr. Sinden's declaration, a critique that systematically (and improperly) draws factual inferences in ABI's favor. The court begins by citing deposition testimony recognizing that "[b]iotin in itself doesn't generate a signal that's detectable." Appx0014. This is true. The signals from biotin -- whether theoretically detectable by infrared spectroscopy, nmr spectroscopy or some other method -- are not practically detectable. To detect biotin, that signal must be amplified, e.g., by reacting biotin with avidin associated with a chromophore, an enzyme or some other stronger signal source. From this deposition testimony, the district court concluded "it would not be accurate to describe indirect detection as a method of signal amplification." This finding runs counter both to Dr. Sinden's explanation of why/how biotin is detected indirectly and to the one provided in the '767 Patent. The flow chart provided in column 19 expressly states that when biotin is reacted with avidin/peroxidase the resulting process is "signal amplification."

Citing further deposition of Dr. Sinden's, the district court then found that "the patent does not disclose techniques for signal amplification, but rather 'utilize[s] technologies that have been around that do amplify signal.'" Appx0014. This, too, is an inference drawn in favor of ABI. The '767 Patent discloses a variety of "indicator molecules" that can be coupled with avidin to amplify a biotin signal, including fluorescent dyes, electron dense reagents and enzymes capable of depositing insoluble reaction products. Appx0125 (1:61-65). The flow chart provided at column 19 describes the process of complexing biotin with these modified avidins as "signal amplification." The district court's real problem was not with the patent's failure to "disclose techniques for signal amplification" -- it clearly does -- but with how those techniques intersect with the patent's point of novelty. The '767 Patent does not purport to disclose new techniques for indirectly detecting compounds like biotin by reacting them with something else. Indeed, the first mention of those techniques comes in the BACKGROUND OF THE INVENTION and is prefaced with the phrase "[it] is also known." Appx0125. However, the distance of those techniques from the patent's point of novelty is immaterial to whether techniques that differ insubstantially can be infringing equivalents. *See Ring & Pinion Service, Inc. v. ARB Corp., Ltd*, 743 F.3d 831 (Fed. Cir. 2014) ("foreseeability" of an alleged equivalent irrelevant).

The district court's analysis concludes by finding the asserted equivalent (i.e., signal amplification through PCR enzymes) was "disclaimed" through the '767 Patent's criticism of radioactive labeling. Appx0014-15. While patents can disclaim an alleged equivalent, the language that does this must be "clear and unconverted" as opposed to a mere statement of the patentee's preference. *See Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1373 (Fed. Cir. 2000). The '767 Patent's critique of radioactive labels cites their hazards, inconvenience, cost and shelf life. The relevance of these issues to PCR enzymes is not explained in the district court's opinion or in ABI's summary judgment briefing.

Enzo is not asserting a scope of equivalents broad enough to encompass all directly detectable labels including radioactive ones. To the contrary, Dr. Sinden's declaration identifies radio labeling as "non-amplifiable signal generation" because "[o]nce the decay occurs, no further detectable signal (an electron) is emitted." Appx0854, ¶ 3. *See DePuy Spine*, 469 F.3d at 1019 (citing expert testimony as to what was not an infringing equivalent). In contrast, fluorescent dideoxynucleotide terminators provide a signal that can be amplified, and in the accused products are amplified, by PCR enzymes that increase the concentration of substrate to be labeled.

Instead of drawing inferences in Enzo's favor, the district court drew them for ABI and in the course of so doing made equivalence findings directly counter

to the only expert declaration submitted on the issue and to the '767 Patent's express disclosure. Its summary holding that claims 1 and 8 are not infringed should be vacated. A jury should decide if those claims are infringed under the doctrine of equivalents.

### III. Claims 67, 68 and 70: The District Court Erroneously Construed This Court's Mandate as Imposing a Construction Contrary to its Precedent

Should this Court find for Enzo on the second issue presented in this appeal, a trial on doctrine of equivalents would not be necessary. Claims 67, 68 and 70, by their own express terms, explicitly define "A" as encompassing the dideoxyterminators provided in the accused BigDye and dRhodamine sequencing kits. If judgment is re-entered based on the jury's verdict that those claims are infringed, any decision regarding claims 1 and 8 would not impact damages or other substantive rights of Enzo's and as such would be purely advisory. Enzo's remaining claims would be dismissed as moot and this case, presumably, would end.

Upon finding this Court's construction of language in claim 1 also applied to these dependent claims, the district court entered judgment in ABI's favor. That court misconstrued this Court's decision to hold in effect that despite plain language to the contrary, claim 67 no longer allows for A to be an "indicator molecule," claim 68 no longer allows for A to be "fluorescent" and claim 70 no longer allows for A to be fluorescein or rhodamine. Because such a holding runs

directly counter to this Court's precedent, this Court's mandate should not have been construed in this way. Instead, it could have and should have been construed to allow for a finding of infringement by subject matter ABI has never contested (and indeed has conceded) is expressly defined in these dependent claims.

### A. Background Relevant to this Court's Mandate

This Court's prior opinion and mandate did not issue in a vacuum. Instead, it should be read in light of its background, specifically the history and function of dependent patent claims and the decision in *Pfizer, Inc. v. Ranbaxy Laboratories, Inc.*, 457 F.3d 1284 (Fed. Cir. 2006).

#### 1. The Independence of Dependent Patent Claims

In dissenting from the *en banc* majority opinion in *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131 (Fed. Cir. 2004), Judge Newman provided an informative summary of the history of dependent claim practice. Originally, the Patent Office required that "each claim should be drawn complete in itself." *Honeywell*, 370 F.3d at 1148 (citing *In re Sexton*, 1873 C.D. 66 (Comm'r Pat. 1973)). Early in the last century, the Office recognized that for clarity, brevity and convenience, dependent claims "would reduce the number of claims and make division between independent inventions clear and easy" because "such a claim would be self-analyzing and self-classifying, and therefore make the examination of the claim easier." *Id.* (citing *Ex parte Brown*, 1917 C.D. 22

(Comm'r Pat. 1917)). Statutory recognition of this practice came in 1965, when § 112 of Title 35 was amended to address dependent claims and § 282 amended to extend the presumption of validity to them. *Id*. The legislative report states that the purpose was "to make clear that dependent claims are to be considered individually on their merits." *Id*. (citing S. Rep. No. 89-301 at 4 (1965), reprinted in 1965 U.S.C.C.A.N. 2315, 2319)). This is all consistent with the general principal that "each claim is a separate statement of the patented invention." *See Pall Corp. v. Micron Separations, Inc*., 66 F.3d 1211, 1220 (Fed. Cir. 1995). *See also Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp*., 294 U.S. 477, 487 (1036) ("[E]ach claim must stand or fall, as itself sufficiently defining invention, independently of the others.").

Dependent claiming is nothing more than a convenience, a way of facilitating patent drafting and examination. The applicant's decision to present a claim in dependent vs. independent format does not impact substantive rights conferred by the patent or in any way alter the right to exclude. If the '767 Patent were reissued with claims 67, 68 and 70 redrafted in independent form,[1] ABI would have no argument -- whether for intervening rights or for improper broadening outside the two-year window -- that the scope of those claims was in any way altered. Nor would ABI have an argument, post-reissue, that those claims

[1] Enzo's right to reissue expired, along with the '767 Patent, in December of 2004.

are not infringed because the argument it does have is based on a construction of language in claim 1. As "separate statement[s] of the patented invention," dependent claims 67, 68 and 70 may be infringed regardless of whether claim 1 covers either the accused infringement or the subject matter defined in these dependent claims.

2. Improper Dependence and *Pfizer v. Ranbaxy*

As one district court has noted, improper dependence -- i.e., where a dependent claim is argued as broader than a claim from which it depends -- is a "topic . . . infrequently litigated." *Spectrum Pharma, Inc. v. Sandoz, Inc.*, 3024 WL6865692 at *22 (D. Nev., Dec. 31, 2013). The infrequency of such litigation results from the rule usually employed to read independent and dependent claims harmoniously, in part to avoid constructions that "might render the dependent claim invalid." *See Curtiss-Wright Flow Control Corp. v. Velan*, *Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). In this case, the Court found this canon of claim construction trumped by others and thereby construed claim 1 to exclude subject matter encompassed by claims 67, 68 and 70.

What then, are the consequences of construing a dependent claim more broadly than the claim from which it depends? As best as Enzo can tell, this is the second case in which this Court has been called upon to address this "infrequently litigated" issue. The first case, *Pfizer, Inc., v. Ranbaxy Laboratories, Ltd.*, 457

F.3d 1284 (Fed. Cir. 2006), involved two Pfizer patents directed to its anti-cholesterol drug, Lipitor. As to its '995 Patent, Pfizer only asserted claim 6, which depended from claim 2, which in turn depended from claim 1. As the district court explained, these claims were directed to:

- claim 1: atorvastatin acid, atorvastatin lactone and acceptable salts thereof
- claim 2: atorvastatin acid and atorvastatin lactone
- claim 6: the hemicalcium salt of compound 2

*Pfizer, Inc. v. Ranbaxy Laboratories, Inc.*, 405 F.Supp. 495, 507 (D. Del. 2005).[2]

Because claim 2 did not cover salts, dependent claim 6 defined subject matter entirely outside its scope, just as claims 67, 68 and 70 of the '767 Patent define subject matter excluded by this Court's construction of claim 1. Ranbaxy urged the Delaware court to find claim 6 not infringed because it "must incorporate all of the limitations of claim 2, from which it depends." *Pfizer*, 405 F.Supp. at 507. The court refused to do that, finding "the language of claim 6 to be unambiguous to the extent that claim 6 is meant to cover the salt atorvastatin calcium." *Id.* Claims 67, 68 and 70 are equally unambiguous in their explicit definition of A as covering indicator molecules, fluorescent materials and rhodamine/fluorescein.

[2] Pfizer's reasons for not asserting claim 1 are not set forth in the opinion but likely related to validity and prior art.

After holding claim 6 infringed, the court addressed Ranbaxy's alternative argument -- an argument waived by ABI in this case -- that claim 6 was invalid. Ranbaxy based its argument on the fourth paragraph of 35 U.S.C. § 112, which provided that "a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed." While recognizing "that there may be a technical problem in the drafting of claim 6," the court found nothing in the legislative history of Section 112, paragraph 4 to suggest "that the law of invalidity should be extended to reach" it. *Id.*, at 508-09. Ranbaxy then appealed both the district court's finding that claim 6 was infringed and its determination that claim 6 was not proven invalid. *Pfizer*, 457 F.3d at 1284.

Had this Court concluded, consistent with Ranbaxy's argument, that noninfringement of claim 2 disposed of Pfizer's claim for infringement of claim 6, it would have decided the case on that basis. But instead of reading the scope of claim 6 as limited by claim 2, the Court found that "claim 6 . . . is completely outside the scope of claim 2." *Pfizer*, 457 F.3d at 1192. Recognizing that claim 6 could have been drafted either as properly dependent from claim 1 or as an independent claim, this Court nonetheless held it "should not rewrite claims to preserve validity." *Id.*

*Pfizer* clearly lays out the consequences of this Court's decision to construe claim 1 of the '767 Patent to exclude subject matter defined in claims 67, 68 and 70. ABI cannot avoid infringement of those claims by subject matter they plainly cover merely because claim 1, which defines a separate property right, is not literally infringed.[3] ABI's only potential defense to claims 67, 68 and 70 -- under its own construction of claim 1 -- would have been to the validity of those claims. However, ABI did not raise that defense in the prior appeal or at any stage prior to the last remand.

**B. This Court Did Not Instruct the District Court to Err**

While this Court's opinion expressly holds that "claim 1 is limited to indirect detection by its own plain meaning," *Enzo Biochem*, 780 F.3d at 1157, it provides no comparable, affirmative guidance on the scope of claims 67, 68 and 70. Presumably, this Court would not have instructed the district to read those claims in a way that is inconsistent with *Pfizer* or with the general notion that claims of a United States patent define separate property rights. Presumably, this Court would have expected the district court to afford those claims the scope that *they* define and not the scope defined in claim 1. In light of the fact that . . .

[3] This Court's statements to the effect that a dependent claim is not infringed if the claim from which it depends is not infringed are, when read in light of *Pfizer*, truisms. If a claim is properly dependent, then its scope is narrower and the maxim applies. But in the "infrequently litigated" instance in which the claim is *not* properly dependent, its scope is broader and *Pfizer* controls.

- the "indicator molecule" of claim 67, like "A" as defined in claims 68 and 70, cannot be read as detectable indirectly
- ABI has provided no explanation -- either to the district court or this Court -- as to how "A" as defined by claims 67, 68 and 70 could possibly be detected indirectly
- this Court has itself recognized that those claims explicitly encompass directly detectable "A", *Enzo Biochem, Inc.*, 708 F.3d at 1156-57
- ABI's appellate counsel admitted before this Court that claims 67 and 68 expressly include and claim 70 is drawn to directly detectable As

. . . any statement by this Court that these claims like claim 1 are limited to indirect detection would be legally erroneous and counter to *Pfizer*.

There is no such statement in this Court's opinion, no instruction that the district court err with respect to these claims. After a general discussion of DNA technology and the problems addressed in the '767 Patent, the Court identified claim 1 as "representative" but did not explain what this means. The most reasonable reading of the Court's opinion, a reading consistent with *Pfizer*, is that claim 1 was "representative" of the claims found in the patent or of the claims asserted at trial. The Court could not have intended that claim 1 be "representative" as dispositive of liability so that validity or infringement of all asserted claims stand or fall with it because: (1) such a finding would have been

counter to *Pfizer* and to the general principal that patent claims define separate property rights, and (2) such designations (and their attendant waivers) are generally agreed to by the litigants, not imposed by the courts.

Elsewhere, this Court's opinion refers to the district court's error in construing "the claims at issue," *Enzo Biochem*, 780 F.3d at 1150, and the "disputed claims of the patent-in-suit." *Id*., at 1157. These statements can likewise be read as consistent with *Pfizer*. Claim 1 was a "claim at issue" and a "disputed claim of the patent-in-suit." If, as this Court found, the district court erred in construing claim 1, then it erred both in construing "the claims at issue" and the "disputed claims of the patent-in-suit." These statements should not be read as instructing the district court to deny claims 67, 68 and 70 the scope they plainly define. In light of *Pfizer*, any such instruction would have invited error, the very error the district court committed when it misconstrued this Court's mandate "to determine, consistent with the analysis in this opinion, whether the accused product infringes." *Enzo Biochem*., 780 F.3d at 1157. In light of *Pfizer*, those products literally infringe claims 67, 68 and 70.

### C. The January 16, 2014 Judgment Should be Reinstated

Under common practice, when an appellate court reverses a judgment following a jury trial on error affecting one claim but not others, the district court should fashion a new judgment using only the portions of the existing verdict

unaffected by the error. *See Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1101 (10th Cir. 2010). In language that uncannily tracks the eleven-year procedural history of this case, the Tenth Circuit explained why this is the preferred practice:

> Indeed, without some specific mandate or identified error requiring so much we can imagine only injustice flowing from any effort to gin up the machinery of trial for a second pass over terrain it took fifteen years for the first trial to mow through. Injustice not only in the needless financial expense and the waste of judicial resources, but injustice in the human costs associated with trying to piece together faded memories and long since filed away evidence, the emotional ordeal parties and witnesses must endure in any retrial, the waste of the work already performed by a diligent and properly instructed jury, and the waiting -- the waiting everyone would have to endure for a final results in a case where everyone's already waited too long, longer than even the lives of today's college graduates.

*Cook*, 790 F.3d at 1105.

1. Infringement Should Not Be Retried

In this case:

- a jury found each of claims 67, 68 and 70 infringed by the accused products
- that jury heard evidence -- evidence ABI does not contest -- that "A" in the accused products is "an indicator molecule" (per claim 67), "fluorescent" (per claim 68) and "selected from the group consisting of fluorescein and rhodamine" (per claim 70)

- nothing in this Court's prior opinion purports to construe claim 67 to exclude an "indicator molecule", claim 68 to exclude a "fluorescent" indicator molecule or claim 70 to exclude "fluorescein and rhodamine."

A new trial on infringement of claims 67, 68 and 70 would plow the same ground mowed by the first jury, waste judicial resources and impose needless expense on all of the parties. It would, in short, pose the very injustice the Tenth Circuit identified in *Cook*.

2. ABI Has Waived Any Defense of Invalidity

In its prior appeal of this matter, ABI did not ask this Court to hold any claim of the '767 Patent invalid under the claim construction it advocated. Instead, the only arguments ABI advanced for invalidity were premised on this Court's *not* adopting its proposed claim construction. Appx0317-18. Nor did ABI suggest that if its proposed claim construction were adopted, this Court should remand to the district court for proceedings that include, e.g., decision of ABI's declaratory judgment counterclaims. *See Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96-97 (1993) (declaratory judgment challenge to patent validity not mooted by a finding of no infringement). ABI asked only for a finding of noninfringement. So when this Court adopted ABI's claim construction, it remanded with instruction that the district court determine "whether the accused product infringes," a mandate phrased like those this Court construes to foreclose

further proceedings on validity. *See Cardiac Pacemakers*, 576 F.3d at 1356; *Odetics, Inc., v. Storage Technology Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). ABI's failure to raise invalidity defenses under the claim construction it advocated and that this Court adopted waived all such defenses going forward. *See Lazare Kaplan Int'l, Inc. v. Photoscribe Technologies, Inc.*, 714 F.3d 1289, 1293 (Fed. Cir. 2013).

3. Damages Need not be Retried

In some cases, this Court's holding that a defendant is liable for some but not all patent claims found infringed by a jury will necessitate a new trial on damages. This is not such a case. Neither parties' expert in any way distinguished any of the asserted claims as supporting any specific portion of their number. Each of claims 1, 8, 67, 68 and 70 was found infringed by all the accused sequencing kits. None of the accused products was specifically identified with or in any way tied to a subset of these claims. Both the parties and their experts assumed that the same damages number would apply regardless of which (if any) of the asserted claims the jury found infringed. If damages are retried, the next jury will hear exactly the same evidence and exactly the same numbers from the parties' experts.

The law does not require this duplication of effort. *TiVo, Inc. v. Echostar Communications*, 516 F.3d 1290 (Fed. Cir. 2008), is especially pertinent. The case involved infringement claims levied against two types of digital video records

(DVRs), referred to by the parties as to "50X" DVR and the "Broadcom" DVR. *TiVo*, 516 F.3d at 1294. Asserted against these DVRs were two types of claims from TiVo's '389 patent, hardware claims (1 and 32) and software claims (31 and 61). Upon finding the hardware claims infringed literally and the software claims infringed under the doctrine of equivalents, a jury awarded TiVo $73,991,964 in damages. *Id*. The district court entered judgment on this verdict.

This Court reversed the portion of the judgment upholding the jury's verdict that the hardware claims were infringed. *TiVo*, 516 F.3d at 1304-05. Upon finding substantial evidence that the data and operations required by the software claims were performed in the accused DVRs, this Court upheld the jury's verdict that those claims were infringed. *Id*., at 1310. This Court expressly affirmed the damages award "[b]ecause the damages calculation at trial was not predicated on the infringement of particular claims." *Id*., at 1412.

The damages calculation in the trial of this case "was not predicated on the infringement of particular claims," either. Because a new trial on damages for infringement of claims 67, 68 and 70 would present exactly the same evidence and argument that the first jury heard and weighed, this Court should not order the district court to hold one.

## CONCLUSION

Enzo respectfully requests this Court to remand this matter to the district court with instruction to re-enter its judgment of January 16, 2014, but only as to claims 67, 68 and 70. Alternatively, Enzo requests that this Court vacate the district court's judgment of February 23, 2016, and remand with instructions to conduct a trial limited to whether claims 1 and 8 of the '767 Patent are infringed under the doctrine of equivalents.

Respectfully submitted,

/S/ L. GENE SPEARS
GENE SPEARS
MICHAEL HAWES
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
Telephone: (713) 229-1234
Facsimile: (713) 229-1522

# ADDENDUM

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ENZO BIOCHEM, INC.,
ENZO LIFE SCIENCES, INC.,
YALE UNIVERSITY ("Enzo")

v. Civil 3:04-cv-929(JBA)

APPLERA CORP.,
TROPIX INC. ("ABI")

## AMENDED JUDGMENT

This matter came on for reconsideration after a second remand from the Federal Circuit which vacated this Court's finding of infringement and directed the Court to "determine, consistent with" the Federal Circuit's analysis, "whether the accused product infringes." Plaintiffs Enzo Biochem, Inc., Enzo Life Sciences, Inc. and Yale University ("Enzo") then moved [Doc. # 566] for entry of judgment on the current jury verdict, and Defendants Applera Corp. and Tropix, Inc. ("Applera") moved [Doc. # 568] for summary judgment. On February 22, 2016, a ruling entered denying Plaintiffs' motion and granting Defendants' motion. It is therefore ORDERED, ADJUDGED and DECREEED; that judgment is entered in the defendant's favor and the case closed.

Dated at New Haven, Connecticut, this 23rd day of February 2016.

ROBIN D. TABORA, Clerk

By /s/
Patty Villano
Deputy Clerk

EOD: 2/23/16

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ENZO BIOCHEM, INC., ENZO LIFE SCIENCES, INC. and YALE UNIVERSITY,<br>*Plaintiffs*,<br>*v.*<br>APPLERA CORP. and TROPIX, INC.,<br>*Defendants*. | Civil No. 3:04cv929 (JBA)<br><br>February 22, 2016 |

**RULING ON PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This twelve-year old case is before this Court after a second remand from the Federal Circuit which vacated this Court's finding of infringement and directed the Court to "determine, consistent with" the Federal Circuit's analysis, "whether the accused product infringes." Plaintiffs Enzo Biochem, Inc., Enzo Life Sciences, Inc. and Yale University ("Enzo") now move [Doc. # 566] for entry of judgment on the current jury verdict, and Defendants Applera Corp. and Tropix, Inc. ("Applera") move [Doc. # 568] for summary judgment. For the following reasons, Plaintiffs' motion is denied and Defendants' motion is granted.

## I. Background

The parties' familiarity with the background of this case is presumed. Briefly, Plaintiffs initiated this patent infringement suit in 2004, accusing Defendants of infringement of six patents, including United States Patent Nos. 5,476,928 ("'928 patent"), 5,449,767 ("'767 patent"), and 5,328,824 ("'824 patent"), which cover various techniques and processes for detecting the presence of a particular strand of nucleic acids (i.e., DNA or RNA) in a sample. (*See* Compl. [Doc. # 1].) Relevant here, the '824, '928, and '767

patents disclose the invention of non-radioactive labeling and specify formation of a complex of hybridized[1] nucleotides and a detectable polypeptide.

Specifically, the '767 and '824 patents claim in part: "A method of detecting the presence or absence of a nucleic acid in a sample which comprises the steps of (a) contacting under hybridizable conditions said sample with at least one compound comprising the structure [DIAGRAM] wherein A comprises at least three carbon atoms and represents at least one component of a signaling moiety capable of producing a detectable signal . . . ." (Claim Construction Ruling [Doc. # 137] at 5 (quoting '824 Pat. 30:49–31:29).) The parties disputed whether this language should be read to encompass both direct and indirect identification systems or only indirect systems.[2] On October 13, 2006, following a *Markman* hearing, this Court issued its Claim Construction Ruling [Doc. # 137], finding in Plaintiffs' favor that the patents cover both direct and indirect detection.

[1] "Hybridization" is "the binding of two separate, complementary strands of nucleic acids to form nucleic acid hybrids." (Claim Constr. Ruling at 1 n.1.)

[2] As the Federal Circuit explained: "[b]ecause hybridization occurs in a predictable manner between complementary strands [of nucleic acids], it is possible to detect the presence of a nucleic acid of interest in a sample. For example, a chemical entity, called a 'label,' can be attached to or incorporated into a nucleic acid strand of a known sequence, called a 'probe,' which will hybridize with a complementary sequence of interest, called a 'target.' Once the probe is hybridized with the target, a detectable signal is generated either from the label itself (referred to as 'direct detection') or from a secondary chemical agent that is bound to the label (referred to as 'indirect detection'). If a signal is detected from the sample after all unhybridized probes have been removed, detection of the signal implies the presence of a target in that sample." *Enzo Biochem Inc. v. Applera Corp.* (*Enzo I*), 780 F.3d 1149, 1151 (Fed. Cir. 2015).

Thereafter, on September 6, 2007, the Court entered summary judgment [Doc. # 261] in favor of Defendants. Plaintiffs appealed, and in a March 26, 2010 decision, the Federal Circuit reversed this Court's judgment that the '767, '824, and '928 patents are invalid for indefiniteness and that the '767 and '824 patents are invalid as anticipated, and affirmed the Court's judgment that the '928 patent is invalid as anticipated. *Enzo Biochem Inc. v. Applera Corp.* (*Enzo II*), 599 F.3d 1325 (Fed. Cir. 2010). On remand, this Court denied [Doc. # 418] Applera's motion for summary judgment on infringement and equitable defenses. Plaintiffs waived their claims for infringement of the '824 patent and limited their assertion of the '767 patent to claims 1,[3] 8,[4] 67,[5] 68,[6] and 70,[7] and the case proceeded to trial.

Following seven days of evidence, the jury returned a verdict finding that Defendants' accused BigDye and dRhodamine dye-terminator products directly

[3] Claim 1 is an independent claim, which reads in relevant part: "An oligo- or polynucleotide containing a nucleotide having the structure [Diagram] . . . wherein A comprises at least three carbon atoms and represents at least one compound of a signaling moiety capable of producing a detectable signal . . . ." ('767 Pat., Ex. 3 to Stone Decl. in Supp. Def.'s Mot. Summ. J. [Doc. # 568-2] 30:48–68.)

[4] Claim 8 covers: "An oligo- or polynucleotide of claim 1 wherein the linkage group includes the moiety $-CH_2-NH-$." (*Id.* 31:36–37.)

[5] Claim 67 states: "An oligo- or polynucleotide of claim 1 . . . wherein A comprises an indicator model." (*Id.* 36:42–44.)

[6] Claim 68 reads: "An oligo- or polynucleotide of claim 67 wherein said indicator model is fluorescent, electron dense, or is an enzyme capable of depositing insoluble reaction products." (*Id.* 36:44–47.)

[7] Claim 70 covers: ""An oligo- or polynucleotide of claim 68 wherein the fluorescent indicator molecule is selected from the group consisting of fluorescein and rhodamine." (*Id.* 36:51–54.)

infringed, and induced customers to infringe, claims 1, 8, 67, 68, and 70 by Defendants' manufacture, use, or sale of their reagent products and sales of DNA sequencing instruments. (*See* Jury Verdict [Doc. # 476].) The jury rejected Defendants' invalidity defenses of lack of written description, lack of enablement, and anticipation, and issued two advisory findings that (1) Enzo had not unreasonably delayed in filing suit, and (2) ABI was not materially prejudiced by the delay in filing this lawsuit. (*Id.*) The jury awarded Enzo $48,587,500.00 in reasonable royalty damages. (*Id.*) Judgment [Doc. # 544] entered in Plaintiffs' favor on January 7, 2014. Defendants appealed.

On appeal, Defendants raised three issues: (1) "[w]hether the finding of infringement should be reversed because, contrary to the district court's claim construction, the '767 patent does not cover the directly detectable terminator nucleotides of the accused products"; (2) "[w]hether, assuming the '767 patent covers direct detection, the patent is invalid for lack of written description because nothing in the specification describes possession of directly detectable nucleotides, and the only disclosure of such nucleotides is prior art which presented problems overcome by the described indirectly detected nucleotides"; and (3) "[w]hether, assuming the '767 patent covers directly detectable nucleotides, the patent is invalid for lack of enablement because nothing in the specification explains how to make or use a directly detectable nucleotide other than certain prior art detection systems, which presented problems overcome by the enabled indirect detection methods." (Defs.' Opening Br., Ex. 1 to Stone Decl. at 16.[8])

---

[8] All page numbers cited in this Ruling correspond to ECF's page numbering, found in the header on each page.

The Federal Circuit began by reciting the language of claim 1, which it stated was "representative." *Enzo II*, 599 F.3d at1152. The entirety of the court's discussion then focused on construing the language of claim 1, at the end of which the court concluded that "as claim 1 is limited to indirect detection by its own plain meaning, it would be inappropriate to use the doctrine of claim differentiation to broaden claim 1 to include a limitation imported from a dependent claim, such as direct detection." *Id.* at 1157. The court therefore held that this Court "erred in construing the disputed claims of the patent-in-suit to cover both direct and indirect detection," and reversed this Court's "claim construction, vacate[d]" the Court's "finding of infringement," and "remand[ed]" to the Court "with instruction to determine, consistent with the analysis in this opinion, whether the accused product infringes." *Id.*

## II. Discussion

The parties' motions raise several distinct issues pertaining to claims 67, 68, and 70 on the one hand, and claims 1 and 8 on the other. These arguments are discussed in turn below.

### A. Claims 67, 68, and 70

With respect to claims 67, 68, and 70, the parties' briefs attempt to reason through the Federal Circuit's somewhat cryptic mandate and its effect on claims 67, 68, and 70. The confusion arises because while Defendants raised the issue on appeal of whether *any of the claims* of the '767 patent cover direct detection (in Defendants' words, whether the "'767 patent . . . cover[s] the directly detectable terminator nucleotides of the accused products" (Defs.' Opening Br. at 16)), the Federal Circuit's opinion analyzes only the language of claim 1, before concluding that "[t]he district court erred in construing the

disputed claims of the patent-in-suit to cover both direct and indirect detection," *Enzo II*, 599 F.3d at 1157 (emphasis added).

Plaintiffs contend that the Court should enter judgment in its favor on claims 67, 68, and 70 because the jury already found that the accused products infringed those claims, and that finding is not affected by the Federal Circuit's decision. (*See* Pls.' Mem. Supp. Mot. for Entry of J. [Doc. # 567] at 13.) According to Plaintiffs, the Federal Circuit construed only claim 1, leaving the scope of claims 67, 68, and 70 unchanged. (*See id.*) Although Plaintiffs acknowledge that under this theory, claims 67, 68, and 70 are broader than claim 1,[9] from which they depend, in violation of 32 U.S.C. § 112 ¶ 4,[10] they argue that Defendants have waived this defense by not raising it earlier, and that if the Federal Circuit thought otherwise, it would have remanded for a determination of invalidity rather than of infringement. (*See id.* at 14–16.) Indeed, Plaintiffs assert, in light of the Federal Circuit's mandate to determine "whether the accused product infringes," *Enzo II*, 599 F.3d at 1157, this Court does not have the discretion to take up invalidity (Pls.' Mem. Supp. at 23–27).

As further support for their reading of the Federal Circuit's decision, Plaintiffs note that while the Federal Circuit took issue with this Court's finding "that dependent claims 67, 68, and 70 . . . involved direct detection and therefore independent claim 1

---

[9] The Federal Circuit construed claim 1 to cover indirect detection while under Plaintiffs' construction, claims 67, 68, and 70 cover direct detection.

[10] Under § 112 ¶ 4, "a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."

must not be limited to indirect detection," *Enzo II*, 599 F.3d at 1156, on the grounds that "dependent claims cannot broaden an independent claim from which they depend," *id.*, under Defendants' interpretation, the Federal Circuit will have "'construe[d] away' that very limitation from the dependent claims it cited as having it" (Pls.' Reply [Doc. # 571] at 2–3).

Plaintiffs argue that their reading best comports with Federal Circuit precedent, citing *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, in which the Federal Circuit held that where a dependent claim and the claim upon which it depends "deal with non-overlapping subject matter," the dependent claim should be held invalid, rather than be construed to cover the same subject matter as the claim upon which it depends. 457 F.3d 1284, 1291–92 (Fed. Cir. 2006). As Plaintiffs put it, "[i]nstead of holding that a circle is a square, the Court accepted that a circle is indeed a circle and held the claim invalid for improper dependency." (Pls.' Reply at 5.)

Defendants, for their part, urge the Court to "enter judgment of non-infringement" in their favor because "[t]he Federal Circuit held that none of 'the claims at issue' in this case covers direct detection" and there is no dispute that the accused products do not infringe a claim limited to indirect detection. (Defs.' Mem. Supp. Mot. Summ. J. [Doc. # 568-1] at 7.) In support of their reading of the Federal Circuit's decision, Defendants note that "[f]rom the first page of the Federal Circuit's decision to the last, the court treated the asserted claims collectively" (*id.* at 15), and discussed the language of claim 1 only after "explaining that '[c]laim 1 is representative' of the asserted claims'" (*id.* at 12 (quoting *Enzo II*, 599 F.3d at 1152); *see* Defs.' Opp'n Mot. for Entry J. [Doc. # 570] at 8–9). Moreover, in its conclusion, the court specifically held that "'[t]he

district court erred in construing the disputed claims of the patent-in-suit to cover both direct and indirect detection,'" again using the plural. (Defs.' Mem. Supp. at 15 (quoting *Enzo II*, 599 F.3d at 1157) (emphasis in Defs.' Mem. Supp. but not in original).)

Like Plaintiffs, Defendants call the Court's attention to the Federal Circuit's decision in *Pfizer*, but in support of the opposite conclusion. (*Id.* at 19.) Defendants maintain that if anything, *Pfizer* "demonstrate[s] the rigidity of the rule" that "'a dependent claim cannot be broader than the claim from which it depends'" (*id.* (quoting *Alcon Research Ltd. v. Apotex, Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012)), even if "the dependent claim covers 'what might otherwise have been patentable subject matter" (*id.* (quoting *Pfizer*, 457 F.3d at 1292)). For this reason, Defendants argue, the Federal Circuit would not have interpreted the dependent claims in a way that made them broader than the claim upon which they depend. (*Id.* at 18; *see* Defs.' Opp'n at 9.)

Finally, Defendants argue that the Federal Circuit never addressed their alternative argument that if the '767 patent covers direct detection, it is invalid for lack of written description or for lack of enablement, indicating to them that the court was not holding that the patent covers direct detection. (Defs.' Mem. Supp. at 16; Defs.' Opp'n at 9–10.)

Although neither party's arguments successfully eliminate all ambiguity from the Federal Circuit's ruling, the Court finds Defendants' interpretation to be the more plausible of the two. It would be odd indeed for the Federal Circuit to continuously use the plural "claims" if it intended to refer only to claim 1. Further, although the conclusion Defendants urge does seem to be in tension with *Pfizer*'s warning that courts "should not rewrite claims to preserve validity," 457 F.3d at 1292 (internal quotation marks omitted),

the Court can conceive of no reason why the Federal Circuit would not have addressed Defendants' alternative arguments if its holding was not that all of the claims cover solely indirect detection. The Court therefore adopts Defendants' interpretation of the Federal Circuit's opinion, holding that the Federal Circuit intended its ruling to construe all of the claims at issue to cover only indirect detection. Because there is no dispute that the accused products utilize direct detection, and Plaintiffs do not claim infringement under a doctrine of equivalents theory with respect to claims 67, 68, and 70, judgment is entered in Defendants' favor on those claims.[11]

**B. Claims 1 and 8**

Turning to claims 1 and 8, both parties agree that "there is no literal infringement under the Federal Circuit's construction." (Pls.' Opp'n Defs.' Mot. Summ. J. [Doc. # 569] at 5.) Nonetheless, "Plaintiffs submit . . . that those claims are—even under that construction—infringed under the doctrine of equivalents." (*Id.*)

As a preliminary matter, the parties dispute whether Plaintiffs waived this argument by "drop[ping] [their] infringement theory that the accused products could be covered by claims limited to indirect detection" after the Court issued the Claim Construction Ruling. (Defs.' Mem. Supp. at 8.) Defendants contend that "[i]f Enzo believed . . . that direct detection was an equivalent of indirect detection, it could have disclosed its view, compiled any evidence in support, offered expert testimony, and sought to moot the claim-construction issue that it knew was heading for post-trial appellate review." (*Id.*) However, as Plaintiffs argue in response, and as Defendants

---

[11] For this reason, the Court does not reach Defendants' contention that the claims are invalid, nor Plaintiffs' assertion that Defendants have waived this defense.

appear to acknowledge in their Reply,[12] when the Federal Circuit addressed this very issue in *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475 (Fed. Cir. 1998), it held that in circumstances similar to these, the plaintiff was not barred from raising a doctrine of equivalents argument, writing:

> Contrary to Lubrizol's suggestion, Exxon cannot be charged with having abandoned its doctrine-of-equivalents theory of liability by not submitting it to the jury or raising it on the previous appeal. Once the district judge construed the claim language in Exxon's favor, the doctrine-of-equivalents issue in the case became moot. Exxon could not realistically be expected to request alternative jury instructions asking for an advisory verdict on whether the patent would be infringed under the doctrine of equivalents on Lubrizol's proposed claim construction. Nor could Exxon, as appellee, have been expected to defend the judgment in its favor on the basis of a theory of liability that was never given to the jury. The question whether there could be doctrine-of-equivalents infringement under the claim construction adopted by this court became a critical issue in the case only after this court's decision on appeal. For that reason, this court did not address the merits of Exxon's claim that it is entitled to a new trial on infringement under the doctrine of equivalents, and the district court therefore erred in concluding that it was barred by this court's mandate from considering Exxon's new trial motion.

*Id.* at 1478–79 (internal citations omitted). For substantially the same reasons as recited by the Federal Circuit in *Exxon*, this Court finds that Plaintiffs are not barred from asserting a doctrine of equivalents theory.

---

[12] In their Reply, rather than continuing to pursue the theory that Plaintiffs waived the doctrine of equivalents argument by failing to raise it earlier, Defendants contend that "[t]he Court should bar Enzo from asserting the doctrine of equivalents because Enzo waived that argument by not asserting it in its own motion." (*See* Defs.' Reply [Doc. # 572] at 9.) This argument, however, for which Defendants cite no authority, does not appear to have any basis in law. The Court is aware of no rule of law prohibiting a party from arguing that summary judgment should not be entered in its opponent's favor on a particular issue while not seeking judgment in its own favor on that issue.

To infringe by equivalence, an accused product or process must "contain elements identical or equivalent to each claimed element of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). "A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007). The "function, way, result inquiry focuses on an examination of the claim and the explanation of it found in the written description of the patent." *Id.* (internal quotation marks omitted).

Plaintiffs contend that summary judgment should not be granted in Defendants' favor as to claims 1 and 8 because there is a genuine dispute of material fact as to whether indirect and direct detection are insubstantially different such that the accused products infringe the '767 patent by equivalence. (*See* Pls.' Opp'n at 5, 11–12.) Relying on the declaration of their expert, Dr. Richard Sinden, Plaintiffs argue that:

> among the problems addressed in the '767 patent are those directed to signal strength and amplification. To detect labeled nucleotides, the "signal" from the label must be strong enough to come within the detection threshold of whatever method is applied to detect it. In order to do that, these signals are typically "amplified" by a variety of techniques, several of which are disclosed in the patent. One of these techniques is indirect detection, i.e., reacting the "A" of claim one with something that yields a stronger signal. Examples of that "something" include antibodies and avidin, the latter of which was known to form strong complexes with biotin, a preferred example of indirectly detection "A." . . .

> Much like the patent's proposed addition of avidin to amplify the signal of a biotinated nucleotide, the accused products also employ materials extraneous to the labeled nucleotides to amplify their signal yield. All of the accused BigDye and dRhodamine kits include polymerase chain reaction (PCR) enzymes. These enzymes amplify the fluorescent signal from DNA sequences labeled with the dye terminators by increasing the concentration of those sequences. The differences between this amplification and the avidin/biotin amplification of the patent's preferred example is that it works by increasing the concentration of molecules producing the signal rather than the signal strength for an individual molecule. . . . As to the indirectly-detectable "A" of claim one, the use of PCR to amplify the signal of DNA sequences labeled by the fluorescent dye terminators in the accused products serves the same function (to make the signal detectable by the methodology employed), in ways that differ insubstantially (increasing concentration vs. increasing strength), to yield the identical result (a detectable signal).

(*Id.* at 11–12 (internal citations omitted).)

Defendants respond that no reasonable jury could find that indirect detection is insubstantially different from direct detection, and summary judgment should therefore be granted in their favor. Specifically, they argue that: (1) Dr. Sinden's theory is "scientific gibberish," as the biotin in the invention "gives off no signal;" rather, "[i]t is the avidin that is detected, after complexing with biotin," and therefore, contrary to Dr. Sinden's declaration, avidin does not "amplify a detectable signal from biotin" (Defs.' Reply at 9–10); (2) the '767 patent does not claim and did not invent signal-amplification techniques (*id.*); and (3) there are fundamental differences between direct and indirect detection (*id.* at 11).

The Court finds Defendants' arguments persuasive. Consistent with the Federal Circuit's understanding of the patent as describing "how 'A,' a biotin, iminobiotin, or lipoic acid, forms a detectable unit, i.e., a signaling moiety, upon interaction with avidin

or antibodies," *Enzo II*, 599 F.3d at 1155, Dr. Sinden himself testified that "[b]iotin in itself doesn't generate a signal that's detectable" (Sinden Dep., Ex. 1 to Defs.' Reply at 7). Because that is so, it would not be accurate to describe indirect detection as a method of signal amplification.

Nor does the patent describe it this way. Rather, the patent describes its method of indirect detection as a superior means of detection as compared to direct detection, with "'detection capacities equal to or greater than products which utilize'" direct detection. *Enzo II*, 599 F.3d at 1155 (quoting '767 Pat. 3:5–13). Although the specification does mention signal amplification in a few places (*see, e.g.*, '767 Pat. 22:23–54), as Dr. Sinden acknowledged in his deposition, the patent does not disclose techniques for signal amplification, but rather "utilize[s] technologies that have been around that do amplify signal" (Sinden Dep. at 9). In Dr. Sinden's words, the claimed invention is not directed so much at improving the "strength of the signal" as improving methods of "signal generation and detection." (*Id.*)

As Defendants aptly note, "[a]n alternative to the claimed invention specifically criticized in the specification for problems that the invention purports to overcome cannot be an 'equivalent' to the invention itself." (Defs.' Mem. Supp. at 28.) Indeed, the Federal Circuit has left no doubt that methods or structures "[s]pecifically identified, criticized, and disclaimed" in a specification cannot later be relied upon as equivalents. *Gaus v. Conair Corp.*, 363 F.3d 1284, 1291 (Fed. Cir. 2004) (internal quotations marks omitted). Because "the specification's only discussion of direct detection, here radioactive labeling, was exclusively in the context of discussing how indirect detection is a superior method," and "[t]he specification not only discusses the limitations and drawbacks of

using radioactive labeling, but states that the claimed compounds can be used 'as an alternative to radioisotopes for detection and localization,'" *Enzo II*, 599 F.3d at 1155 (quoting '767 Pat. 3:5–13), Plaintiffs cannot now claim that indirect and direct detection are insubstantially different, and no jury could so find.[13] Summary judgment is therefore granted in Defendants' favor on claims 1 and 8.

## III. Conclusion

For the foregoing reasons, Plaintiffs' Motion [Doc. # 566] for Entry of Judgment on the Current Jury Verdict is DENIED, and Defendants' Motion [Doc. # 568] for Summary Judgment is GRANTED. Judgment is entered in Defendants' favor. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22nd day of February 2016.

[13] Because the Court grants Defendants summary judgment on claims 1 and 8, it does not reach Defendants' contention that claim 1 does not cover mononucelotides. (*See* Defs.' Mem. Supp. at 27–30.)

US005449767A

# United States Patent [19]

**Ward et al.**

[11] **Patent Number: 5,449,767**

[45] **Date of Patent: * Sep. 12, 1995**

[54] **MODIFIED POLYNUCLEOTIDES AND METHODS OF PREPARING SAME**

[75] Inventors: **David C. Ward**, Guilford, Conn.; **Pennina R. Langer**, Monsey, N.Y.; **Alexander A. Waldrop, III**, Charlottesville, Va.

[73] Assignee: **Yale University**, New Haven, Conn.

[ * ] Notice: The portion of the term of this patent subsequent to Dec. 8, 2004 has been disclaimed.

[21] Appl. No.: **886,660**

[22] Filed: **May 20, 1992**

**Related U.S. Application Data**

[60] Continuation of Ser. No. 130,002, Dec. 8, 1987, abandoned, which is a division of Ser. No. 496,915, May 23, 1983, Pat. No. 4,711,955, which is a continuation-in-part of Ser. No. 255,223, Apr. 17, 1981, abandoned.

[51] **Int. Cl.**[6] .............................................. **C07H 21/00**

[52] **U.S. Cl.** ................................ **536/24.3**; 536/25.32; 536/25.6; 536/26.6

[58] **Field of Search** .................... 536/24.3, 25.32, 25.6, 536/26.6; 435/6

[56] **References Cited**

U.S. PATENT DOCUMENTS

3,328,389 6/1967 Shimizu et al. .................. 260/211.5

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

070685 1/1983 European Pat. Off. .
70687 1/1983 European Pat. Off. .

(List continued on next page.)

OTHER PUBLICATIONS

Trayer et al., "Preparation of Adenosine Nucleotide Derivatives Suitable for Affinity Chromatography", *Biochem. J.* (1974) 139:609–623.

(List continued on next page.)

*Primary Examiner*—Che S. Chereskin
*Attorney, Agent, or Firm*—Ronald C. Fedus; John L. Santalone

[57] **ABSTRACT**

Compounds having the structure:




wherein B represents 7-deazapurine, or pyrimidine moiety covalently bonded to the $C^{1'}$-position of the sugar moiety, provided that when B is 7-deazapurine, it is attached at the $N^9$-position of the 7-deazapurine and when B is pyrimidine, it is attached at the $N^1$-position;

wherein A represents a moiety consisting of at least three carbon atoms which is capable of forming a detectable complex with a polypeptide when the compound is incorporated into a double-stranded ribonucleic acid, deoxyribonucleic acid duplex, or DNA-RNA hybrid;

wherein the dotted line represents a chemical linkage joining B and A, provided that if B is 7-deazapurine, the linkage is attached to the 7-position of the deazapurine, and if B is pyrimidine, the linkage is attached to the 5-position of the pyrimidine; and

wherein each of x, y and z represents




or




either directly, or when incorporated into oligo- and polynucleotides, provide probes which are widely useful.

**71 Claims, No Drawings**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,337,530 | 8/1967 | Hanze | 260/211.5 |
| 3,338,882 | 8/1967 | Wechter | 260/211.5 |
| 3,804,826 | 4/1974 | Schelt et al. | 260/211.5 R |
| 3,893,998 | 7/1975 | Secrist, III et al. | 260/211.5 R |
| 3,915,958 | 10/1975 | Shuman et al. | 260/211.5 R |
| 3,917,583 | 11/1975 | Meyer et al. | 260/211.5 R |
| 3,960,840 | 6/1976 | Secrist, III et al. | 260/211.5 R |
| 3,968,101 | 7/1976 | Christensen et al. | 260/211.5 |
| 4,008,363 | 2/1977 | Re et al. | 536/28 |
| 4,038,480 | 7/1977 | Robins et al. | 536/27 |
| 4,048,307 | 9/1977 | Yokota et al. | 424/180 |
| 4,067,774 | 1/1978 | Rubenstein et al. | 195/63 |
| 4,086,417 | 4/1978 | Ishida et al. | 536/29 |
| 4,088,639 | 5/1978 | Zappelli et al. | 260/112.5 R |
| 4,096,324 | 6/1978 | Kelly et al. | 536/23 |
| 4,134,792 | 1/1979 | Boguslaski et al. | 195/99 |
| 4,151,349 | 4/1979 | Traeger et al. | 536/28 |
| 4,171,432 | 10/1979 | Carrico et al. | 536/26 |
| 4,213,893 | 7/1980 | Carrico et al. | 260/112.5 |
| 4,228,237 | 10/1980 | Hevey et al. | 435/7 |
| 4,230,698 | 10/1980 | Bobek et al. | 424/180 |
| 4,230,797 | 10/1980 | Boguslaski et al. | 435/7 |
| 4,247,544 | 1/1981 | Bergstrom et al. | 424/180 |
| 4,261,893 | 4/1981 | Boguslaski et al. | 260/326 N |
| 4,267,171 | 5/1981 | Bergstrom et al. | 424/180 |
| 4,302,204 | 11/1981 | Wahl et al. | 23/230.3 |
| 4,318,980 | 3/1982 | Boguslaski et al. | 435/7 |
| 4,318,981 | 3/1992 | Burd et al. | 435/7 |
| 4,318,982 | 3/1982 | Hornby et al. | 435/7 |
| 4,355,165 | 10/1982 | Boguslaski et al. | 544/237 |
| 4,358,535 | 11/1982 | Falkow et al. | 435/5 |
| 4,363,759 | 12/1982 | Boguslaski et al. | 260/112.7 |
| 4,374,925 | 2/1983 | Litman et al. | 435/7 |
| 4,380,580 | 4/1983 | Boguslaski et al. | 435/7 |
| 4,383,031 | 5/1983 | Boguslaski et al. | 435/7 |
| 4,446,231 | 5/1984 | Self | 435/7 |
| 4,469,863 | 9/1984 | Ts'o et al. | 536/27 |
| 4,581,333 | 4/1986 | Kourilsky et al. . | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2618419 | 11/1976 | Germany . | |
| 2618511 | 11/1976 | Germany . | |
| 3045375 | 7/1982 | Germany . | |
| 18-24191 | 10/1943 | Japan | 16 E/611.2 |
| 58-62194 | 4/1983 | Japan . | |
| 1548741 | 7/1979 | United Kingdom . | |
| 1552607 | 9/1979 | United Kingdom . | |
| 2019408 | 10/1979 | United Kingdom . | |
| 2026690 | 2/1980 | United Kingdom . | |
| 1564578 | 4/1980 | United Kingdom . | |
| 2034323 | 6/1980 | United Kingdom . | |
| 2041922 | 9/1980 | United Kingdom . | |
| 2045239 | 10/1980 | United Kingdom . | |
| 2125964 | 3/1984 | United Kingdom . | |
| 8302276 | 7/1983 | WIPO . | |
| 8302277 | 7/1983 | WIPO . | |
| 8302286 | 7/1983 | WIPO . | |

OTHER PUBLICATIONS

Broker, et al. (Feb. 1978) Nucleic Acids Research 5:363–383.

Tekman, et al Journal of Biological Chemistry (Nov. 1960), Vol. 235:3254–3259.

Bergstrom, D. E. and Ruth, J. L., "Synthesis of C-5 Substituted Pyrimidine Nucleosides via Organopalladium Intermediates", JACS 98:6, 1587–1588 (1976).

Bigge, C. F. "Synthesis of 5-Styryl Derivatives of Uracil Nucleosides and Nucleotides", Tetrahedron letters, 19, 1653–1656 (1979).

Bayley et al., Methods in Enzymology, vol. 46, 69–114 (1977).

E. A. Bayer and M. Wilchek, "The Use of the Avidin–Biotin Complex as a Tool in Molecular Biology," in *Methods of Biochemical Analysis,* 26, pp. 1–45 (1980).

D. Bergstrom and M. Ogawa, "C-5 Substituted Pyrimidine Nucleosides. 2". Synthesis Via Olefin Coupling To Organopalladium Intermediates Derived From Uridine and 2'-Deoxyuridine, *J. Am. Chem. Soc.,* 100, pp. 8106–8112 (1978) [Bergstrom I].

D. Bergstrom and J. L. Ruth, "Properties of C-5 Mercurated Pyrimidine Nucleosides," *J. Carbohydrates, Nucleotides and Nucleosides,* 4, pp. 257–289 (1977) [Bergstrom II].

C. F. Bigge et al., "Palladium-Catalyzed Coupling Reactions of Uracil Nucleosides and Nucleotides," *J. Am. Chem. Soc.,* 102, pp. 2033–2038 (1980).

C. Brandon et al., "Structure of a New Pyrimidine from *Bacillus Subtilis* Phage SP-15 Nucleic Acid", *Nature New Biology,* 239, pp. 70–71 (1972).

T. R. Broker et al., "Electron Microscopic Visualization Of tRNA Genes with Ferritin–Avidin: Biotin Labels," *Nucl. Acids Res.,* 5, pp. 363–383 (1978).

R. M. K. Dale et al., "Direct Covalent Mercuration of Nucleotides and Polynucleotides," *Biochemistry,* 14, pp. 2447–2457 (1975) [Dale I].

M. Ya. Feldman, *Reactions of Nucleic Acids and Nucleoproteins With Formaldehyde,* __Ed. (19__).

J. L. Guesdon et al., "The Use of Avidin-Biotin Interaction In Immunoenzymatic Techniques", *J. Histochem. and Cytochem.* 27, pp. 1131–1139 (1979).

OTHER PUBLICATIONS

H. Hayashi and K. Nakanishi, "Synthesis and Absolute Configuration of (+)-5-(4',5'-Dihydroxypentyl)uracil from *Bacillus Subtilis* Phage SP-15 Deoxyribonucleic Acid," *J. Am. Chem. Soc.*, 95, pp. 4081-4083 (1973) [Hayashi I].

H. Hayashi et al. "Structure and Synthesis of Dihydroxypentyluracil from Bacteriophage SP-15 Deoxyribonucleic Acid," *J. Am. Chem. Soc.*, 95, pp. 8749-8757 (1973) [Haysahi II].

P. R. Langer et al., "Enzymatic Synthesis of Biotin-Labeled Polynucleotides: Novel Nucleic Acid Affinity Probes", *Proc. Natl. Acad. Sci. USA*, 78, pp. 6633-6637 (1981) [LangerI].

P. R. Langer and D. C. Ward, "A Rapid and Sensitive Immunological Method For In Situ Gene Mapping," in *Developmental Biology Using Purified Genes*, ed. D. D. Brown, Academic Press, pp. 647-658 (1981) [Langer II].

P. R. Langer and D. C. Ward, Abstract 1153: "A Rapid and Sensitive Immunological Method For In Situ Gene Mapping," in Journal of Supramolecular Structure and Cellular Biology, ed. Alan R. Liss, Inc. (1981) [Langer III].

Manning et al., "A Method for Gene Enrichment Based on the Avdin-Biotin Interaction. Application to the *Drosophila* Ribosomal RNA Genes," *Biochemistry*, 16, pp. 1364-1370 (1977) [Manning I].

M. Pellegrini et al., "Application of the Avidin-Biotin Method of Gene Enrichment to the Isolation of Long Double-Strande DNA Containing Specific Gene Sequences", *Nucl. Acids Res., 4, pp. 2961-2973 (1977).*

J. L. Ruth and D. E. Bergstrom, "C-5 Substituted Pyrimidine Nucleosides. 1. Synthesis of C-5 Allyl, Propyl, and Propenyl Uracil and Cytosine Nucleosides via Organopalladium Intermediates," *J. Org. Chem.*, 43, pp. 2870-2876 (1978).

A. Sodja and N. Davidson, "Gene Mapping and Gene Enrichment by the Avidin-Biotin Interaction: Use of Cytochrome-C as a Polyamine Bridge," *Nucl. Acids Res.*, 5, pp. 383-399 (1978).

M. Swierkowski and D. Shugar, "Poly 5-Ethyluridylic Acid, A Polyuridylic Acid Analogue", *J. Mol. Biol.*, 47, pp. 57-67 (1970).

J. G. J. Bauman et al., "A New Method for Fluorescence Microscopical Localization of Specific DNA Sequences by In Situ Hybridization of Fluorochrome-Labelled RNA", *Exp. Cell Res.*, 128, pp. 485-490 (1980) [Bauman I].

J. G. J. Bauman et al., "Rapid and High Resolution Detection of in situ Hybridisation to Polytene Chromosomes Using Fluorochrome-Labeled RNA," *Chromosoma* (Berl.) 84, pp. 1-18 (1981) [Bauman II].

D. Bergstrom and J. L. Ruth, "Preparation of C-5 Mercurated Pyrimidine Nucleosides," *J. Carbohydrates, Nucleotides and Nucleosides*, 4, pp. 257-269 (1977) [Bergstrom II].

R. M. K. Dale et al., "The Synthesis and Enzymatic Polymerization of Nucleotides Containing Mercury: Potential Tools for Nucleic Acid Sequencing and Structural Analysis", *Proc. Natl. Acad. Sci. USA*, 70, pp. 2238-2242 (1973) [Dale II].

W. S. Dallas and S. Falkow, "Molecular and Genetic Analysis of a DNA Sequence Encoding for Enterotoxin Snythesis in *Escherichia coli*, " *Thirteenth Joint Conference on Cholera*, The U.S.-Japan Cooperative Medical Science Program (1979) [Dallas I].

W. S. Dallas et al., "The Characterization of an *Escherichia coli* Plasmid Determinant That Encodes for the Production of a Heat-Labile Enterotoxin," *Plasmids of Medical Environmental and Commercial Importance*, K. N. Timmis and A. Puhler, editors, Elsevier/North-Holland Biomedical Press (1979) [Dallas II].

D. J. Eckermann and R. H. Symons, "Sequence at the Site of Attachment of an Affinity-Label Derivative of Puromycin on 23-S Ribosomal RNA of *Escherichia coli* Ribosomes," *Eur. J. Biochem.*, 82, pp. 225-234 (1978).

H. G. Gratzner, "Monoclonal Antibody to 5-Bromo— and 5-Iododeoxyuridine: A New Reagent for Detection of DNA Replication," *Science*, 218, pp. 474-475 (1982).

M. Grunstein and D. Hogness, "Colony Hybridization: A Method for the Isolation of Cloned DNAs That Contain a Specific Gene", *Proc. Natl. Acad. Sci. USA*, 72, pp. 3961-3965 (1975).

K. Hofmann et al., "Iminobiotin Affinity Columns And Their Application To Retrieval Of Streptanidin", *Proc. Natl. Acad. Sci. USA*, 77, pp. 4666-4668 (1980).

E. S. Huang and J. S. Pagano, "Nucleic Acid Hybridization Technology and Detection of Proviral Genomes," *Methods Virol.* 6, pp. 457-497 (1977).

A. M. Jeffrey et al., "Benzo[a] pyrene-Nucleic Acid Derivative Found In Vivo: Structure of a Benzo[a]-pyrenetetrahydrodiol Epoxide-Guanosine Adduct," *J. Am. Chem. Soc.*, 98, pp. 5714-5715 (1976).

R. G. Kallen et al., "The Occurrence of a New Pyrimidine Base Replacing Thymine in a Bacteriophage DNA: 5-Hydroxymethyl Uracil," *J. Mol. Biol.* 5, pp. 248-250 (1962).

D. E. Kennel, "Principles And Practicss of Nucleic Acid Hybridization" Pro. Nucl. Acid Res., 11, 259-301 (1971).

M. Koreeda et al., "Alkylation of Polyguanylic Acid at the 2-Amino Group and Phosphate by the Potent Mutagen (±)-7$\beta$, 8$\alpha$-Dihydroxy-9 $\beta$,10$\beta$ epoxy —7,8,9,-10-tetrahydrobenzo[a]pyrene," *J. Am. Chem. Soc.*, 98, pp. 6720-6722 (1976).

OTHER PUBLICATIONS

T. T. Kuo et al., "5-Methylcytosine Replacing Cytosine in the Deoxyribonucleic Acid of a Bacteriophage for *Xanthomonas oryzae*," *J. Mol. Biol.*, 34, pp. 373-375 (1978).

I. R. Lehman and E. A. Pratt, "On the Structure of the Glucosylated Hydroxymethylcytosine Nucleotides of Coliphages T2, T 4 and T6," *J. Biol. Chem.* 235, pp. 3254-3259 (1960).

E. T. Maggio (ed.), *Enzyme-Immunoassay* (1980).

J. E. Manning et al., "A New Method Of in situ Hybridization," *Chromosoma* (Berl), 53, pp. 107-117 (1975) *Manning II*].

J. Marmur et al., "Unique Properties of nucleic Acid from *Bacillus Subtilis* Phage SP-15, *Nature New Biology*, 239, pp. 68-70 (1972).

T. W. Munns and M. K. Liszewski, "Antibodies Specific for Modified Nucleotides: An Immunochemical Approach for the Isolation and Characterization of Nucleic Acids," in *Progress in Nucleic Acid Research and Molecular Biology*, ed. W. E. Cohn, Academic Press, 24, pp. 109-165 (1980).

T. Nelson and D. Brutlag, "Addition of Homopolymers to the 3'—ends of Duplex DNA with Terminal Transferase," *Methods in Enzymology* (vol. 68) *Recombinant DNA, ed. R. Wu, pp. 41-50.*

J. Reiser et al., "Transfer of Small DNA Fragments From Polyacrylamide Gels to Diazobengyloxymethyl Paper and Detection by Hybridization with DNA Probes," Biochemical and Biophysical Research Communications, 85, pp. 1104-1112 (1978).

P. W. J. Rigby et al., "Labeling Deoxyribonucleic Acid to High Specific Activity In Vitro to Nick Translation with DNA Polymerase I,"*J. Mol. Biol.*, 113, pp. 237-251 (1977).

G. T. Rudkin and R. D. Stollar, "High Resolution Detection of DNA-RNA Hybrids in situ by Indirect Immunofluorescence", *Nature*, 265, pp. 472-473 (1977).

M. So, "Characterization of an *Escherichia coli* Plasmid Encoding for the Synthesis of Heat-Labile Toxin: Molecular Cloning of the Toxin Determinant", *Infection and Immunity* 21, pp. 405-411 (1978).

Lubert Stryer, Biochemistry, 3rd ed., c. 1975, 1981, 1988 See p. 184, "Formation of an Enzyme-Substrate Complex is the First Step in Enzymatic Catalysis".

C.-Y. Lee et al. "8-(6-Aminohexyl)-Amino-Adenine Nucleotide Derivatives for Affinity Chromatography, "Arch. Biochem. Biophys. 163, pp. 561-569 (1974).

# MODIFIED POLYNUCLEOTIDES AND METHODS OF PREPARING SAME

The invention disclosed and/or claimed in this application was made in the course of work carried out under grants from the Public Health Service, National Institute of General Medical Research Grant No. P50-GM20124; Public Health Service, National Cancer Institute Training Grant No. T32-CA09159; and Public Health Service, National Institute of General Medical Science Grant No. T32-GM07499. The Government has certain rights in the invention.

This is continuation of application Ser. No. 07/130,002, filed Dec. 8, 1987, now abandoned, which is in turn a division of application Ser. No. 06/496,915, filed May 23, 1983, issued Dec. 8, 1987 as U.S. Pat. No. 4,711,955. Application Ser. No. 06/496,915 is in turn a continuation of application Ser. No. 06/255,223, filed Apr. 17, 1981, now abandoned.

## BACKGROUND OF THE INVENTION

Many procedures employed in biomedical research and recombinant DNA technology rely heavily on the use of nucleotide or polynucleotide derivatives radioactively labeled with isotopes of hydrogen ($^3H$), phosphorous ($^{32}p$), carbon ($^{14}C$), or iodine ($^{125}I$). Such radioactive compounds provide useful indicator probes that permit the user to detect, monitor, localize, or isolate nucleic acids and other molecules of scientific or clinical interest, even when present in only extremely small amounts. To date, radioactive materials have provided the most sensitive, and in many cases the only, means to perform many important experimental or analytical tests. There are, however, serious limitations and drawbacks associated with the use of radioactive compounds. First, since personnel who handle radioactive material can be exposed to potentially hazardous levels of radiation, elaborate safety precautions must be maintained during the preparation, utilization, and disposal of the radioisotopes. Secondly, radioactive nucleotides are extremely expensive to purchase and use, in large part due to the cost of equipment and manpower necessary to provide the appropriate safeguards, producer-/user health monitoring services, and waste-disposal programs. Thirdly, radioactive materials are often very unstable and have a limited shelf-life, which further increases usage costs. This instability results from radiolytic decomposition, due to the destructive effects associated with the decay of the radioisotope itself, and from the fact that many isotopes (e.g. $^{32}p$ and $^{125}I$) have half-lives of only a few days

It is known that haptens can combine with antibodies, but can initiate an immune response only if bound to a carrier. This property can be exploited in detection and identification testing.

It is also known that biotin and iminobiotin strongly interact with avidin, a 68,000 dalton glycoprotein from egg white. This interaction exhibits one of the tightest, non-covalent binding constants ($K_{dis}=10^{-15}$) seen in nature. If avidin is coupled to potentially demonstrable indicator molecules, including fluorescent dyes, e.g. fluorescein or rhodamine; electron-dense reagents, e.g. ferritin, hemocyanin, or colloidal gold; or enzymes capable of depositing insoluble reaction products, e.g. peroxidase or alkaline phosphatase, the presence, location, or quantity of a biotin probe can be established. Although iminobiotin binds avidin less tightly than



biotin, similar reactions can be used for its detection. Moreover, the reversibility of the iminobiotin-avidin interaction, by decreasing solution pH, offers significant advantages in certain applications.

The specificity and tenacity of the biotin-avidin complex has been used in recent years to develop methods for visually localizing specific proteins, lipids, or carbohydrates on or within cells (reviewed by E. A. Bayer and M. Wilchek in Methods of Biochemical Analysis, 26, 1, 1980). Chromosomal location of RNA has been determined by electron microscopy using a biotinized protein, cytochrome C, chemically crosslinked to RNA as a hybridization probe. The site of hybridization was visualized through the binding of avidin-ferritin or avidin-methacrylate spheres mediated by the avidin-biotin interaction. (J. E. Manning, N. D. Hershey, T. R. Broker, M. Pellegrini, H. K. Mitchell, and N. Davidson, Chromosoma, 53, 107, 1975; J. E. Manning, M. Pellegrini, and N. Davidson, Biochemistry, 61, 1364, 1977; T. R. Broker, L. M. Angerer, P. H. Yen, N. D. Hersey, and N. Davidson, Nucleic Acid Res., 5, 363, 1978; A Sodja and N. Davidson, Nucleic Acid Res., 5, 383, 1978.) This approach to the detection of polynucleotide sequences, although successful in the specialized cases examined which were highly reitterated sequences, is not of general utility for analysis of polynucleotides present in single or low copy number.

Moreover, methods for attaching chemical moieties to pyrimidine and purine rings are known. Several years ago a simple and rapid acetoxymercuration reaction was developed for introducing covalently bound mercury atoms into the 5-position of the pyrimidine ring, the C-8 position of the purine ring or the C-7 position of a 7-deazapurine ring, both in nucleotides and polynucleotides. (R. M. K. Dale, D. C. Livingston and D. C. Ward, Proc. Natl. Acad. Sci. U.S.A., 70, 2238, 1973; R. M. K. Dale, E. Martin, D. C. Livingston and D. C. Ward, Biochemistry, 14, 2447, 1975.) It was also shown several years ago that organomercurial compounds would react with olefinic compounds in the presence of palladium catalysts to form carbon-carbon bonds (R. F. Heck, J. Am. Chem. Soc., 90, 5518, 1968; R. F. Heck, Ibid., 90, 5526, 1968; R. F. Heck, Ibid., 90, 5531, 1968; R. F. Heck, Ibid., 90, 5535, 1968; and R. F. Heck, J. Am. Chem. Soc. 91, 6707, 1969.) Bergstrom and associates (J. L. Ruth and D. E. Berstrom, J. Org. Chem., 43, 2870, 1978; and D. E. Bergstrom and M. K. Ogawa, J. Am. Chem. Soc., 100, 8106, 1978) and Bigge, et al. (C. F. Bigge, P. Kalaritis, J. R. Deck and M. P. Mertes, J. Am. Chem. Soc., 102, 2033, 1980) have recently applied this reaction scheme in the synthesis of C-5 substituted pyrimidine nucleotide compounds.

Finally, it is known that antibodies specific for modified nucleotides can be prepared and used for isolating and characterizing specific constituents of the modified nucleotides. (T. W. Munns and M. K. Liszewski, Progress in Nucleic Acid Research and Molecular Biology, 24, 109, 1980.) However, none of the antibodies prepared to date against naturally occurring nucleotides have been shown to react with their nucleotide determinant when it exists in a double-stranded RNA or DNA duplex or when in DNA-RNA hybrid molecules.

To circumvent the limitations of radioactively labeled probes or previously utilized chemical and biological probes, a series of novel nucleotide derivatives that contain biotin, iminobiotin, lipoic acid, and other determinants attached covalently to the pyrimidine or purine ring have been synthesized. These nucleotide deriva-

tives, as well as polynucleotides and coenzymes that contain them, will interact specifically and uniquely with proteins such as avidin or antibodies. The interaction between modified nucleotides and specific proteins can be utilized as an alternative to radioisotopes for the detection and localization of nucleic acid components in many of the procedures currently used in biomedical and recombinant-DNA technologies. Methods employing these modified nucleotide-protein interactions have detection capacities equal to or greater than procedures which utilize radioisotopes and they often can be performed more rapidly and with greater resolving power.

These new nucleotide derivatives can be prepared relatively inexpensively by chemical procedures which have been developed and standarized as discussed more fully hereinafter. More significantly, since neither the nucleotide probes of this invention nor the protein reagents employed with them are radioactive, the compounds can be prepared, utilized, and disposed of, without the elaborate safety procedures required for radioisotopic protocols. Moreover, these nucleotide derivatives are chemically stable and can be expected to have functional shelf-lives of several years or more. Finally, these compounds permit the development of safer, more economical, more rapid, and more reproducible research and diagnostic procedures.

## SUMMARY OF THE INVENTION

Compounds having the structure:



wherein B represents a purine, deazapurine, or pyrimidine moiety covalently bonded to the $C^1$-position of the sugar moiety, provided that when B is purine or 7-deazapurine, it is attached at the $N^9$-position of the purine or deazapurine, and when B is pyrimidine, it is attached at the $N^1$-position;

wherein A represents a moiety consisting of at least three carbon atoms which is capable of forming a detectable complex with a polypeptide when the compound is incorporated into a double-stranded ribonucleic acid, deoxyribonucleic acid duplex, or DNA-RNA hybrid;

wherein the dotted line represents a chemical linkage joining B and A, provided that if B is purine the linkage is attached to the 8-position of the purine, if B is 7-deazapurine, the linkage is attached to the 7-position of the deazapurine, and if B is pyrimidine, the linkage is attached to the 5-position of the pyrimidine; and

wherein each of x, y, and z represents

$$\text{H—, HO—, HO—}\overset{\overset{\displaystyle O}{\|}}{\underset{\underset{\displaystyle OH}{|}}{P}}\text{—O—, HO—}\overset{\overset{\displaystyle O}{\|}}{\underset{\underset{\displaystyle OH}{|}}{P}}\text{—O—}\overset{\overset{\displaystyle O}{\|}}{\underset{\underset{\displaystyle OH}{|}}{P}}\text{—O—, or}$$

-continued

$$\text{HO—}\overset{\overset{\displaystyle O}{\|}}{\underset{\underset{\displaystyle OH}{|}}{P}}\text{—O—}\overset{\overset{\displaystyle O}{\|}}{\underset{\underset{\displaystyle OH}{|}}{P}}\text{—O—}\overset{\overset{\displaystyle O}{\|}}{\underset{\underset{\displaystyle OH}{|}}{P}}\text{—O—,}$$

are widely useful as probes in biomedical research and recombinant DNA technology.

Particularly useful are compounds encompassed within this structure which additionally have one or more of the following characteristics: A is non-aromatic; A is at least $C^5$; the chemical linkage joining B and A includes an α-olefinic bond; A is biotin or iminobiotin; and B is a pyrimidine or 7-deazapurine.

These compounds may be prepared by a process which involves:

(a) reacting a compound having the structure:



with a mercuric salt in a suitable solvent under suitable conditions so as to form a mercurated compound having the structure:



(b) reacting said mercurated compound with a chemical moiety reactive with the $-Hg^+$ portion of said mercurated compound and represented by the formula . . . N, said reaction :being carried out in an aqueous solvent and in the presence of $K_2PdCl_4$ under suitable conditions so as to form a compound having the structure:



wherein N is a reactive terminal functional group or is A; and

(c) recovering said compound as said modified nucleotide when N is A, or when N is a reactive terminal group, reacting said compound with a compound having the structure M-A, wherein M represents a functional group reactive with N in an aqueous solvent under suitable conditions so as to form said modified nucleotide, which is then recovered.

This invention also provides compounds having the structure:



wherein each of B, B', and B" represents a purine, 7-deazapurine, or pyrimidine moiety covalently bonded to the C[1']-position of the sugar moiety, provided that whenever B, B', or B" is purine or 7-deazapurine, it is attached at the N[9]-position of the purine or 7-deazapurine, and whenever B, B', or B" is pyrimidine, it is attached at the N[1]-position;

wherein A represents a moiety consisting of at least three carbon atoms which is capable of forming a detectable complex with a polypeptide when the compound is incorporated into a double-stranded duplex formed with a complementary ribonucleic or deoxyribonucleic acid molecule.

wherein the dotted line represents a chemical linkage joining B and A, provided that if B is purine the linkage is attached to the 8-position of the purine, if B is 7-deazapurine, the linkage is attached to the 7-position of the deazapurine, and if B is pyrimidine, the linkage is attached to the 5-position of the pyrimidine;

wherein z represents H— or HO—; and

wherein m and n represent integers from 0 up to about 100,000.

These compounds can be prepared by enzymatic polymerization of a mixture of nucleotides which include the modified nucleotides of this invention. Alternatively, nucleotides present in oligo- or polynucleotides may be modified using chemical methods.

Nucleotides modified in accordance with the practices of this invention and oligo- and polynucleotides into which the modified nucleotides have been incorporated may be used as probes in biomedical research, clinical diagnosis, and recombinant DNA technology. These various utilities are based upon the ability of the molecules to form stable complexes with polypeptides which in turn can be detected, either by means of properties inherent in the polypeptide or by means of detectable moieties which are attached to, or which interact with, the polypeptide.

Some uses include detecting and identifying nucleic acid-containing etiological agents, e.g. bacteria and viruses; screening bacteria for antibiotic resistance; diagnosing genetic disorders, e.g. thalassemia and sickle cell anemia; chromosomal karyotyping; and identifying tumor cells.

## DETAILED DESCRIPTION OF THE INVENTION

Several essential criteria must be satisfied in order for a modified nucleotide to be generally suitable as a substitute for a radioactively-labeled form of a naturally occurring nucleotide. First, the modified compound must contain a substituent or probe that is unique, i.e., not normally found associated with nucleotides or polynucleotides. Second, the probe must react specifically with chemical or biological reagents to provide a sensitive detection system. Third, the analogs must be relatively efficient substrates for commonly studied nucleic acid enzymes, since numerous practical applications require that the analog be enzymatically metabolized, e.g., the analogs must function as substrates for nucleic acid polymerases. For this purpose, probe moieties should not be placed on ring positions that sterically, or otherwise, interfere with the normal Watson-Crick hydrogen bonding potential of the bases. Otherwise, the substituents will yield compounds that are inactive as polymerase substrates. Substitution at ring positions that alter the normal "anti" nucleoside conformation also must be avoided since such conformational changes usually render nucleotide derivatives unacceptable as polymerase substrates. Normally, such considerations limit substitution positions to the 5-position of a pyrimidine and the 7-position of a purine or a 7-deazapurine.

Fourth, the detection system should be capable of interacting with probe substituents incorporated into both single-stranded and double-stranded polynucleotides in order to be compatible with nucleic acid hybridization methodologies. To satisfy this criterion, it is preferable that the probe moiety be attached to the purine or pyrimidine through a chemical linkage or "linker arm" so that it can readily interact with antibodies, other detector proteins, or chemical reagents.

Fifth, the physical and biochemical properties of polynucleotides containing small numbers of probe substituents should not be significantly altered so that current procedures using radioactive hybridization

probes need not be extensively modified. This criterion must be satisfied whether the probe is introduced by enzymatic or direct chemical means.

Finally, the linkage that attaches the probe moiety should withstand all experimental conditions to which normal nucleotides and polynucleotides are routinely subjected, e.g., extended hybridization times at elevated temperatures, phenol and organic solvent extraction, electrophoresis, etc.

All of these criteria are satisfied by the modified nucleotides described herein.

These modified nucleotides have the structure:




wherein B represents a purine, 7-deazapurine, or pyrimidine moiety covalently bonded to the C1'-position of the sugar moiety, provided that when B is purine or 7-deazapurine, it is attached at the N9-position of the purine or 7-deazapurine, and when B is pyrimidine, it is attached at the N1-position;

wherein A represents a moiety consisting of at least three carbon atoms which is capable of forming a detectable complex with a polypeptide when the compound is incorporated into a double-stranded ribonucleic acid, deoxyribonucleic acid duplex, or DNA-RNA hybrid;

wherein the dotted line represents a linkage group joining B and A, provided that if B is purine the linkage is attached to the 8-position of the purine, if B is 7-deazapurine, the linkage is attached to the 7-position of the deazapurine, and if B is pyrimidine, the linkage is attached to the 5-position of the pyrimidine; and

wherein each of x, y and z represents




These compounds are widely useful as probes in biomedical research and recombinant DNA technology.

Although in principal all compounds encompassed within this structural formula may be prepared and used in accordance with the practices of this invention, certain of the compounds are more readily prepared or used or both, and therefore are presently preferred.

Thus, although purines, pyrimidines and 7-deazapurines are in principal useful, pyrimidines and 7-deazapurines are preferred since purine substitution at the 8-position tends to render the nucleotides ineffective as polymerase substrates. Thus, although modified purines are useful in certain respects, they are not as generally useful as pyrimidines and 7-deazapurines. Moreover, pyrimidines and 7-deazapurines useful in this invention must not be naturally substituted at the 5-or 7- positions, respectively. As a result, certain bases such as thymine, 5-methylcytosine, and 5-hydroxymethylcytosine are not useful. Presently preferred bases are cytosine, uracil, deazaadenine and deazaguanine.

A may be any moiety which has at least three carbon atoms and is capable of forming a detectable complex with a polypeptide when the modified nucleotide is incorporated into a double-stranded duplex containing either deoxyribonucleic or ribonucleic acid.

A therefore may be any ligand which possesses these properties, including haptens which are only immunogenic when attached to a suitable carrier, but are capable of interracting with appropriate antibodies to produce complexes. Examples of moieties which are useful include:




Of these the preferred A moieties are biotin and iminobiotin.

Moreover, since aromatic moieties tend to intercalate into a base-paired helical structure, it is preferred that the moiety A be nonaromatic. Also, since smaller moieties may not permit sufficient molecular interaction with polypeptides, it is preferred that A be at least $C_5$ so that sufficient interaction can occur to permit formation of stable complexes. Biotin and iminobiotin satisfy both of these criteria.

The linkage or group joining moiety A to base B may include any of the well known bonds including carbon-carbon single bonds, carbon-carbon double bonds, carbon-nitrogen single bonds, or carbon-oxygen single bonds. However, it is generally preferred that the chemical linkage include an olefinic bond at the $\alpha$-position relative to B. The presence of such an $\alpha$-olefinic bond serves to hold the moiety A away from the base when the base is paired with another in the well known double-helix configuration. This permits interaction with polypeptide to occur more readily, thereby facilitating complex formation. Moreover, single bonds with greater rotational freedom may not always hold the moiety sufficiently apart from the helix to permit recognition by and complex formation with polypeptide.

It is even more preferred that the chemical linkage group be derived from a primary amine, and have the structure —$CH_2$—NH—, since such linkages are easily formed utilizing any of the well known amine modification reactions. Examples of preferred linkages derived from allylamine and allyl-(3-amino-2-hydroxy-1-propyl) ether groups have the formulae

—CH=CH—$CH_2$—NH— and

—CH=CH—$CH_2$—O—$CH_2$—CH(OH)—$CH_2$—NH—,

respectively.

Although these linkages are preferred, others can be used, including particularly olefin linkage arms with other modifiable functionalities such as thiol, carboxylic acid, and epoxide functionalities.

The linkage groups are attached at specific positions, namely, the 5-position of a pyrimidine, the 8-position of a purine, or the 7-position of a deazapurine. As indicated previously, substitution at the 8-position of a purine does not produce a modified nucleotide which is useful in all the methods discussed herein. It may be that the 7-position of a purine, which is occupied by a nitrogen atom, could be the point of linkage attachment. However, the chemical substitution methods employed to date and discussed herein are not suitable for this purpose.

The letters x, y, and z represent groups attached to the 5′, 3′, and 2′ positions of the sugar moiety. They may be any of

H—, HO—, HO—P(=O)(OH)—O—, HO—P(=O)(OH)—O—P(=O)(OH)—O—, or

HO—P(=O)(OH)—O—P(=O)(OH)—O—P(=O)(OH)—O—.

Although conceivable, it is unlikely that all of x, y, and z will simultaneously be the same. More likely at least one of x, y, and z will be a phosphate-containing group, either mono-, di-, or tri-phosphate and at least one will be HO— or H—. As will be readily appreciated, the most likely identity of z will be HO— or H— indicating ribonucleotide or deoxyribonucleotide, respectively. Examples of such nucleotides include 5′-ribonucleoside monophosphates, 5′-ribonucleoside diphosphates, 5′-ribonucleoside triphosphates, 5′-deoxyribonucleoside monophosphates, 5′-deoxyribonucleoside diphosphates, 5′-deoxyribonucleoside triphosphates, 5′p-ribcnucleoside-3′p, and 5′p-deoxyribonucleoside-3′p. More specific examples include modified nucleotides of this type in which A is biotin or iminobiotin, the chemical linkage is

—CH=CH—$CH_2$—NH— or

—CH=CH—$CH_2$—O—$CH_2$—CH(OH)—$CH_2$—NH—,

and B is uracil or cytosine.

The general synthetic approach adopted for introducing the linker arm and probe moiety onto the base is discussed hereinabove. (See especially, J. L. Ruth and D. E. Bergstrom, Org. Chem., 43, 2870, 1978; D. E. Bergstrom and M. K. Ogawa, J. Amer. Chem. Soc. 100, 8106, 1978; and C. F. Bigge, P. Kalaritis, J. R. Deck and M. P. Mertes, J. Amer. Chem. Soc. 102, 2033, 1980.) However, the olefin substituents employed herein have not been used previously. To facilitate attachment of probe moiety A, it has been found particularly desirable to employ olefins with primary amine functional groups, such as allylamine [AA] or allyl-(3-amino-2-hydroxy-1-propyl) ether [NAGE], which permit probe attachment by standard amine modification reactions, such as,




Because of ease of preparation it has been found preferable to use NHS-esters for probe addition. However, olefin linker arms with other modifiable functional groups, such as thiols, carboxylic acids, epoxides, and the like, can also be employed. Furthermore, both linker arm and probe can be added in a single-step if deemed desirable.

Specifically, modified nucleotides having the structure:



wherein B represents a purine, 7-deazapurine, or pyrimidine moiety covalently bonded to the C$^{1'}$-posi-

tion of the sugar moiety, provided that when B is purine or 7-deazapurine, it is attached at the $N^9$-position of the purine or deazapurine, and when B is pyrimidine, it is attached at the $N^1$-position;

wherein A represents a moiety consisting of at least three carbon atoms which is capable of forming a detectable complex with a polypeptide when the compound is incorporated into a double-stranded ribonucleic acid, deoxyribonucleic acid duplex, DNA-RNA hybrid;

wherein the dotted line represents a chemical linkage joining B and A, provided that if B is purine, the linkage is attached to the 8-position of the purine, if 7-deazapurine, the linkage is attached to the 7-position of the deazapurine, and if B is pyrimidine, the linkage is attached to the 5-position of the pyrimidine; and

wherein each of x, y, and z represents



can be prepared by:

(a) reacting a compound having the structure:



with a mercuric salt in a suitable solvent under suitable conditions so as to form a mercurated compound having the structure:



(b) reacting said mercurated compound with a chemical moiety reactive with the —$Hg^+$ portion, of said mercurated compound and represented by the formula . . . N, said reaction being carried out in an aqueous solvent and in the presence of $K_2PdCl_4$ under suitable conditions so as to form a compound having the structure:





wherein N is a reactive terminal functional group or is A; and

(c) recovering said compound as said modified nucleotide when N is A, or when N is a reactive terminal group, reacting said compound with a compound having the structure M-A, wherein M represents a functional group reactive with N in an aqueous solvent under suitable conditions, so as to form said modified nucleotide, which is then recovered.

The following schema is illustrative:




Although the reactions can be carried out at hydrogen ion concentrations as low as pH 1, or as high as pH 14, it is preferred to operate in the range from about 4 to 8. This is especially true when dealing with unstable compounds such as nucleoside polyphosphates, polynucleotides, and nucleotide coenzymes which are hydrolyzed at pH's outside this range. Similarly, it is preferred to operate at a temperature in the range from about 20° C. to 30° C. to avoid possible decomposition of labile organic substrates. However, the reactions can be carried out at temperatures from about 5° C. to 100° C. As

is usual with chemical reactions, higher temperatures promote the reaction rate and lower temperatures retard it. Thus, in the temperature range from 5° C. to 100° C., the optimum reaction time may vary from about 10 minutes to 98 hours. In the preferred temperature range, reaction times normally vary from about 3 to 24 hours.

The preferred procedure for maintaining the pH in the desired range is through the use of buffers. A variety of buffers can be employed. These include, for example, sodium or potassium acetate, sodium or potassium citrate, potassium citrate-phosphate, tris-acetate and borate-sodium hydroxide buffers. The concentration of buffer, when employed, can vary over a wide range, up to about 2.0 molar.

While a particular advantage of the mercuration and palladium catalyzed addition reactions is that they can be carried out in water, small amounts of an organic solvent can be usefully included as a solubility aid. The organic solvents usually chosen are those which are miscible with water. These may be selected from ethers, alcohols, esters, ketones, amides, and the like such as methanol, ethanol, propanol, glycerin, dioxane, acetone, pyridine and dimethylformamide. However, since it has been observed that the presence of alcohols, such as methanol, often results in alkoxy-addition across the olefin double bond, any organic solvent used as a solubility aid should be chosen carefully. Introduction of alkoxy substituents to the $^{\alpha}$- or $^{\beta}$-exocyclic carbon atoms often results in the production of compounds which are utilized much less efficiently as enzyme substrates.

Although various mercuric salts may be utilized, the presently preferred salt is mercuric acetate. Also, as indicated previously, the compounds may be prepared by first adding a linker arm and then the moiety A, or by adding a linker arm to which A is already attached. Thus, the chemical moiety represented by the formula . . . N may be any one of the numerous entities which ultimately result in production of the desired compounds.

Examples include

$$-CH=CH-CH_2-NH_2,$$

$$-CH=CH-CH_2-O-CH_2-\underset{\displaystyle OH}{\underset{|}{CH}}-CH_2-NH_2,$$

$$-CH=CH-CH_2-NH\text{-biotin, and}$$

$$-CH=CH_2-CH_2-O-CH_2-\underset{\displaystyle OH}{\underset{|}{CH}}-CH_2-NH\text{-iminobiotin.}$$

The amounts of the reactants employed in these reactions may vary widely. However, in general the amounts of unmercurated compound, mercurated compound, and palladium-containing compound will be substantially stoichiometric whereas the mercuric salt and compound . . . N will be present in molar excess, e.g. 5–20 moles of . . . N or of mercuric salt per mole of mercurated compound or unmercurated compound, respectively. In practice, amounts will vary depending upon variations in reaction conditions and the precise identity of the reactants.

Having the biotin probe directly attached to nucleotide derivatives that are capable of functioning as enzyme substrates offers considerable versatility, both in the experimental protocols that can be performed and in the detection methods (microscopic and non-microscopic) that can be utilized for analysis. For example, biotin nucleotides can be introduced into polynucleotides which are in the process of being synthesized by cells or crude cell extracts, thus making it possible to detect and/or isolate nascent (growing) polynucleotide chains. Such a procedure is impossible to do by any direct chemical modification method. Furthermore, enzymes can be used as reagents for introducing probes such as biotin into highly selective or site-specific locations in polynucleotides; the chemical synthesis of similar probe-modified products would be extremely difficult to achieve at best.

The synthesis of nucleotides containing biotin or iminobiotin was achieved as detailed in the examples set forth hereinafter. Pyrimidine nucleoside triphosphates containing either of these probes attached to the C-5 carbon atom were good to excellent substrates for a wide variety of purified nucleic acid polymerases of both prokaryotic and eukaryotic origin. These include DNA polymerase I of *E. coli*, bacteriophage T4 DNA polymerase, DNA polymerases $\alpha$ and $\beta$ from murine (A-9) and human (HeLa) cells, and the DNA polymerase of Herpes simplex virus. Confirming data were obtained with *E. coli* DNA polymerase I using either the nicktranslation condition of Rigby, et al. (P. W. J. Rigby, M. Dieckmann, C. Rhodes and P. Berg, J. Mol. Biol. 113, 237, 1977) or the gap-filling reaction described by Bourguignon et al. (G. J. Bourguignon, P. J. Tattersall and D. C. Ward, J. Virol. 20, 290, 1976). Bio-dUTP has also been found to function as a polymerase substrate both in CHO cells, permeabilized by treatment with lysolecithin according to the method of Miller, et al. (M. R. Miller, J. C. Castellot, Jr. and A. B. Pardee, Exp. Cell Res. 120, 421, 1979) and in a nuclear replication system prepared from Herpes simplex infected BHK cells. Although biotinyl ribonucleoside triphosphates were found to function as substrates for the RNA polymerases of *E. coli* and bacteriophage T7, they are not utilized as efficiently as their deoxyribonucleotide triphosphate counterparts. Indeed, they are incorporated poorly, if at all, by the eukaryotic RNA polymerases examined (HeLa cell RNA polymerase III, calf thymus RNA polymerase II and mouse cell RNA polymerase II). While this limited range of substrate function does restrict the utility in some in vivo or in vitro transcription studies, biotinlabeled RNA probes can be prepared enzymatically from DNA templates using *E. coli* or T7 RNA polymerases or by 3′ endlabeling methods using RNA ligase with compounds such as biotinyl-pCp. The AA- and NAGE-derivatives of UTP are, however, substrates for the eukaryotic RNA polymerases mentioned above. With the availability of antibodies to these analogs, the isolation of nascent transcripts by immunological or affinity procedures should be feasible.

The enzymatic polymerization of nucleotides containing biotin or iminobiotin substituents was not monitored directly, since neither of these probes were radiolabeled. However, two lines of experimental evidence clearly show that the biotinyl-nucleotides were incorporated. The first is that polynucleotides synthesized in the presence of biotinnucleotides are selectively retained when chromatographed over avidin or streptavidin affinity columns. (Tables I and II) For example, whereas normal DNA, nick translated with $^{32}$P-dAMP, is quantitatively eluted upon the addition of 0.5M NaCl,

the vast majority of biotinyl-DNA or iminobiotinylDNA remains bound to the resin even after extensive washing with high salt, urea, quanidine-HCl, formamide or 50 mM NaOH. The small fraction of the radiolabel eluted by these washing conditions is not retained when applied to the resin a second time, suggesting that radioactivity is associated with DNA fragments which are free of biotin substitution. The second line of evidence is that only biotin-labeled polynucleotides are immunoprecipitated when treated with purified anti-biotin IgG followed by formalin-fixed *Staphylococcus aureus*. (Table III) It is-clear from the data in these tables that extremely small amounts of biotin can be detected by this method. These results also show that the biotin molecule can be recognized by avidin, streptavidin or specific antibodies while the DNA is still in its native, double-stranded form, a condition that is absolutely essential if the antibody-binding or avidin-affinity approaches are to be useful in probe detection employing hybridization techniques.

## TABLE I

SELECTIVE RETENTION OF BIOTINIZED DNA ON AVIDIN-SEPHAROSE

| Eluent | | % DNA Retained on Resin: Bio-DNA (1%) | T-DNA |
|---|---|---|---|
| Load - | 3 × 105 cpm 10 mM Tris 7.5 + 0.2M NaCl | 100 | 100% |
| (1) | 0.5M NaCl | 100 | 0.1 |
| (2) | 1.0M NaCl | 99.7 | <0.01 |
| (3) | 8M Urea | 100 | <0.01 |
| (4) | 6M guanidine-HCl | 95.2 | <0.01 |
| (5) | 99% formamide | 94.7 | <0.01 |
| (6) | 2 mM Biotin | 97.6 | <0.01 |
| (7) | 50 mM NaOH | 89.5 | <0.01 |

## TABLE II

Affinity Chromatography of Iminobiotin-dUTP and Iminobiotinized - DNA on Streptavidin-Sepharose

| Eluent | | % Retained on SA-Sepharose: T-DNA | $^3$H-IB-dUTP | IB-DNA |
|---|---|---|---|---|
| Load - | 10 mM Tris-HCl, 8.3 50 mM NaCl | 8.7 | 100 | 99.7 |
| (1) | 0.1M NaCl | <0.1 | 100 | 99.7 |

## TABLE II-continued

Affinity Chromatography of Iminobiotin-dUTP and Iminobiotinized - DNA on Streptavidin-Sepharose

| Eluent | | % Retained on SA-Sepharose: T-DNA | $^3$H-IB-dUTP | IB-DNA |
|---|---|---|---|---|
| (2) | 1.0M NaCl | <0.01 | 100 | 99.4 |
| (3) | 8M Urea | <0.01 | 97.5 | 98.5 |
| (4) | 6M guanidine-HCl | <0.01 | 97.0 | 97.0 |
| (5) | 50 mM $NH_4$-acetate, pH 4.0 | <0.01 | <0.01 | 96.5 |
| (6) | 50 mM $NH_4$-acetate, pH 4.0 2 mM biotin | <0.01 | <0.01 | <0.01 |

## TABLE III

SELECTIVE IMMUNOPRECIPITATION OF BIO-DNA WITH ANTI-BIOTIN IgG and *STAPH AUREUS*

| DNA* | Antibody | CPM in Immuno ppt. | CPM in Supernatant |
|---|---|---|---|
| T-DNA | — | 70 | 4867 |
| T-DNA | Anti-Bio IgG | 87 | 5197 |
| T-DNA | Non-immune IgG | 55 | 5107 |
| Bio-DNA | — | 53 | 3886 |
| Bio-DNA | Anti-Bio IgG | 3347 | 736 |
| Bio-DNA | Non-immune IgG | 60 | 3900 |

*N.T. pBR-322 DNA, $^{32}$p-labeled; 1% Biotin substitution.
Specific activity, 2 × $10^7$ cpm/μg
Biotin detection 0.001–0.01 pmoles.

Thus, it is possible to prepare novel compounds having the structure:




wherein each of B, B', and B'' represents a purine, deazapurine, or pyrimidine moiety covalently bonded to the C$^{1'}$-position of the sugar moiety, provided that whenever B, B', or B'' is purine or 7-deazapurine, it is attached at the N$^9$-position of the purine or deazapurine, and whenever B, B', or B'' is pyrimidine, it is attached at the N$^1$-position;

wherein A represents a moiety consisting of at least three carbon atoms which is capable of forming a detectable complex with a polypeptide when the compound is incorporated into a double-stranded duplex formed with a complementary ribonucleic or deoxyribonucleic acid molecule.

wherein the dotted line represents a linkage group joining B and A, provided that if B is purine, the linkage is attached to the 8-position of the purine, if B is 7-deazapurine, the linkage is attached to the 7-position of the deazapurine, and if B is pyrimidine, the linkage is attached to the 5-position of the pyrimidine;

wherein z represents H— or HO—; and

wherein m and n represent integers from 0 up to about 100,000.

Of course, it should be readily understood that in general m and n will not simultaneously be 0 since, in that event, the compound becomes merely a modified nucleotide as described previously. In general B' and B" will vary within the same oligo- or polynucleotide, being alternatively uracil, cytosine, thymine, guanine, adenine, or the like. Also, in general, the variation will correspond to the ordered sequence of nucleotides which codes for the synthesis of peptides according to the well known Genetic Code. However, it is intended that the structure shown also embrace polynucleotides such as poly C, poly U, poly r(A-U), and poly d(A-U) as well as calf thymus DNA, ribosomal RNA of *E. coli* or yeast, bacteriophage RNA and DNA (R17, fd), animal viruses (SV40 DNA), chromosomal DNA, and the like, provided only that the polynucleotides be modified in accordance with this invention.

It is also to be understood that the structure embraces more than one modified nucleotide present in the oligomer or polymer, for example, from two to thirty modified nucleotides. The critical factor in this regard is that the number of modifications not be so great that the polynucleotide is rendered ineffective for the intended use.

Finally, it should be understood that modified oligo- and polynucleotides can be joined to form larger entities having the same structure so long as terminal groups are rendered compatible or reactive. These compounds can be made by enzymatic polymerization of appropriate nucleotides, especially nucleotide triphosphates in the presence of a nucleic acid template which directs synthesis under suitable conditions. Such conditions can vary widely depending upon the enzyme employed, amounts of nucleotides present, and other variables. Illustrative enzymes include DNA polymerase I of *E. coli*, bacteriophage T4 DNA polymerase, DNA polymerases $\alpha$ and $\beta$ from murine and human (HeLa) cells, DNA polymerase from Herpes simplex virus, RNA polymerase of *E. coli*, RNA polymerase of bacteriophage T7, eukaryotic RNA polymerase including HeLa cell RNA polymerase III, calf thymus RNA polymerase II, and mouse cell RNA polymerase II.

Also, the compounds can be prepared by terminal addition to oligo- or polynucleotides to produce compounds in which m or n is 0 depending upon whether the addition is at the 5' or 3' position. Moreover, the compounds such as pCp or pUp in which the base is biotinized can be added to existing molecules employing the enzyme RNA ligase.

Modified oligo- and polynucleotides can also be prepared by chemical modification of existing oligo- or polynucleotides using the approach described previously for modification of individual nucleotides.

The various modified nucleotides, oligonucleotides, and polynucleotides of this invention may be detected by contacting the compounds with polypeptides which are capable of forming complexes therewith under suitable conditions so as to form the complexes, provided that the polypeptides include one or more moieties which can be detected when the complex or complexes is or are formed, generally by means of conventional detection techniques.

One polypeptide detector for the biotinyl-type probe is avidin. The avidin-biotin interaction exhibits one of the tightest non-covalent binding constants ($K_{dis}=10^{-15}$) seen in nature. If avidin is coupled to potentially demonstrable indicator molecules, e.g., fluorescent dyes (fluoroscein, rhodamine), electron-dense reagents (ferritin, hemocyanin, colloidal gold), or enzymes capable of depositing insoluble reaction products (peroxidase, alkaline phosphatase) the presence, location and/or quantity of the biotin probe can be established.

Avidin has, unfortunately, one property that makes it less desirable as a biotin-indicator protein when used in conjunction with nucleic acids or chromatin material. It has been reported (M. H. Heggeness, Stain Technol., 52, 165, 1977; M. H. Heggeness and J. F. Ash, J. Cell. Biol., 73, 783, 1977; E. A. Bayer and M. Wilchek, Methods of Biochemical Analysis 26, 1, 1980) that avidin binds tightly to condensed chromatin or to subcellular fractions that contain large amounts of nucleic acid in a manner which is independent of its biotin-binding property. Since avidin is a basic glycoprotein with a pI of 10.5, its histone-like character or its carbohydrate moieties are most likely responsible for these observed nonspecific interactions.

A preferred probe for biotin-containing nucleotides and derivatives is streptavidin, an avidin-like protein synthesized by the soil organism *Streptomyces avidinii.* Its preparation and purification is described in Hoffman, et al., Proc. Natl. Acad. Sci., 77, 4666 (1980). Streptavidin has a much lower pI (5.0), is non-glycosylated, and shows much lower non-specific binding to DNA than avidin, and therefore offers potential advantages in applications involving nucleic acid detection methodology.

A most preferred protein for biotin-like probe detection is monospecific rabbit IgG, antibiotin immunoglobulin. This compound was prepared by immunizing rabbits with bovine serum albumin conjugated biotin as described previously (M. Berger, Methods in Enzymology, 62, 319 [1979]) and purified by affinity chromatography. Although the association constant of immunoglobulin-haptens have values of $K_{assn}$ ($10^6$ to $10^{10}$) which are considerably lower than for avidin-biotin complexes, they are substantially equivalent to those observed with the avidin-iminobiotin complex. Furthermore, the anti-biotin antibodies have proven extremely useful in detecting specific polynucleotide sequences on chromosomes by in situ hybridization since little, if any, non-specific binding of the antibody to chromatin material occurs.

The modified polynucleotides of this invention are capable of denaturation and renaturation under conditions compatible with their use as hybridization probes. An analysis of the thermal denaturation profiles and hybridization properties of several biotin-substituted DNA and RNA polymers clearly indicates this. For example, pBR 322 DNA or $\lambda$ DNA, nick translated to introduce approximately 10–100 biotin residues per kilobase, have Tm values essentially identical to that of the control, biotin-free DNAs. Furthermore, $^{32}P$-labeled, biotin-substituted, pBR 322 DNA, exhibited the same degree of specificity and autoradiographic signal intensity as control, thymidine-containing DNA, when

used as a hybridization probe for detecting bacterial colonies containing the plasmid.

In DNA duplexes, such as MVM RF DNA, in which every thymidine residue in one strand (1250 in toto per 5 Kb) is replaced by a biotinyl-nucleotide, the Tm is only 5° C. less than that of the unsubstituted control. Although the Tm of poly d(A-bioU) in which each base pair contains a bio-dUMP residue is 15° C. lower than the poly d(A-T) control, the degree of cooperativity and the extent of hyperchromicity observed both during denaturation and renaturation were the same for the two polymers. A parallel analysis of RNA duplexes and DNA/RNA hybrids indicates that their Tm's also decrease as the biotin-content of the polymer increases. However, it is clear that a substantial number of biotin-molecules can be introduced without significantly altering the hybridization characteristics of the polymers.

These results strongly suggested that biotin-substituted polynucleotides could be used as probes for detecting and/or localizing specific polynucleotide sequences in chromosomes, fixed cells, or tissue sections. The general protocol for detecting the biotin-substituted probe is schematically illustrated as follows:

GENERAL PROTOCOL FOR PROBE DETECTION VIA IN SITU, COLONY, OR NORTHERN/SOUTHERN HYBRIDIZATION METHODS




This general scheme illustrates only procedures used for gene mapping (cytogenetics), and recombinant DNA-technologies. However, it can be equally well applied to the detection of nucleic acid sequences of bacterial, viral, fungal or parasite origin in clinical samples and this forms the basis of a powerful new approach to clinical diagnostics which does not rely on the use of radioisotopes.

Immunological and histochemical methods for the detection of biotin have shown that the basic approach is useable for a rapid method of gene mapping in situ hybridization and non-radioactive procedures for detecting specific nucleic acid sequences by blotting hybridization methods. Use may be made of this technology in development of new clinical diagnostic procedures.

Using this approach, it is possible to determine the presence of a specific deoxyribonucleic or ribonucleic acid molecule, particularly such a molecule derived from a living organism, e.g. bacteria, fungus, virus, yeast, or mammal. This in turn permits diagnosis of nucleic acid-containing etiological agents in a patient or other subject.

Moreover, it provides a method for screening bacteria to determine antibiotic resistance. Thus, for example, penicillin resistance in *Streptococcus pyogenes* or *Neisseris meningitidis*; tetracycline resistance in *Staphylococcus aureus, Candida albicans, Pseudomonas aeruginosa, Streptococcus pyogenes*, or *Neisseria gonorrhoeae*; and aminoglycoside resistance in *Mycobacterium tuberculosis* can be determined.

In these methods a polynucleotide is prepared which is complementary to the nucleic acid sequence which characterizes the organism or its antibiotic resistance and which additionally includes one or more modified nucleotides according to this invention. This polynucleotide is hybridized with nucleic acid obtained from the organism under scruntiny. Failure to hybridize indicates absence of the organism or of the resistance characteristic. Hybridized nucleic acid duplexes are then identified by forming a complex between the duplex and a suitable polypeptide which carries a detectable moiety, and detecting the presence of the complex using an appropriate detection technique. Positive detection indicates that the complex, the duplex and therefore the nucleic acid sequence of interest are present.

This approach can be extended to the diagnosis of genetic disorders, such as thalassemia and sickle cell anemia. The deoxyribonucleotide acid gene sequence whose presence or absence (in the case of thalassemia) is associated with the disorder can be detected following hybridization with a polynucleotide probe according to this invention based upon complex formation with a suitable detectable polypeptide.

The mapping of genes or their transcripts to specific loci on chromosomes has been a tedious and time-consuming occupation, involing mainly techniques of cell-fusion and somatic cell genetics. Although in situ hybridization has been employed successfully for mapping single-copy gene sequences in species that undergo chromosomes polytenization, such as Drosophiia, detection of unique sequence genes in most higher eukaryotic chromosomes has been extremely difficult, if not impossible, using standard hybrization methods. The necessity for polynucleotide probes of very high specific radioactivity to facilitate autoradiographic localization of the hybridization site also results in rapid radio decomposition of the probe and a concomitant increase in the background noise of silver grain deposition. The use of hybridization probes with low to moderate specific radio activities requires exposure times of many days or weeks, even to detect multicopy sequences, such as ribosomal RNA genes or satellite DNA. Since recombinant DNA technology has made feasible the molecular cloning of virtually every single-copy sequence found in eukaryotic cells, it would be extremely beneficial to have a rapid and sensitive method

for mapping the chromosomal origin of such cloned genomic fragments.

Modified nucleotides may be used in a method of gene mapping by in situ hybridization which circumvents the use of radioisotopes. This procedure takes advantage of a thymidine analogue containing biotin that can be incorporated enzymatically into DNA probes by nick translation. After hybridization in situ the biotin molecules serve as antigens for affinity purified rabbit anti-biotin antibodies. Immunofluorescent antibody sandwiches made with fluorescein-labeled goat anti-rabbit IgG allow for rapid and specific cytogenetic localization of cloned gene sequences as green-yellow bands. This method offers four major advantages over conventional autoradiographic methods of in situ gene localization; less background noise, an increase in resolving power between bands; a decrease in the time required to determine the site of probe hybridization; and chemically stable hybridization probes. This method has been applied successfully to the localization of reitterated and unique DNA sequences in the polytene chromosome of *Drosophila milanogaster* and satellite DNA on mouse metaphase chromosomes.

Thus it has been found that polytene chromosomes could be used as a test system for establishing the efficacy of probes using the modified nucleotides according to the instant invention as detected by indirect immunofluorescence for in situ gene mapping. The probes included a variety of cloned Drosophila sequences obtained from Otto Schmidt and Dieter Söll, such as tRNA genes cloned in plasmid vectors with inserts of sizes ranging from about 5 to about 22 kilobases. Many of these clones have already been assigned to specific bands on the Drosophila chromosome map by conventional in situ hybridization methods employing radioisotopes.

DNA probes were nick translated in the presence of Bio-dUTP. Occasionally $^3H$ dATP and/or $^3H$ dCTP was included in the nick translation reaction mixture. This allowed both autoradiographic and immunofluorescent localization of a sequence on a single chromosone spread. In situ hybridization was performed as described in M. L. Pardue, and J. G. Gall, Methods in Cell Biol., 10, 1 (1975). After the final 2×SSC wash to remove unhybridized probe, the slides were rinsed with PBS (phosphate buffered saline) and incubated at 37° C. with 2.5 μg/ml Rabbit anti-biotin in PBS and 10 mg/ml BSA for 2–16 hours. This was followed by incubation of the slides with FITC labeled Goat anti-Rabbit IgG (Miles Laboratories, diluted 1:100 in PBS and 10 mg/ml BSA) for one-four hours. Evans Blue was often required as a red counterstain to see the chromosomes with fluorescent illumination.

When plasmids pBR 17D and pPW 539 containing 5 Kb and 22 Kb inserts, respectively, were hybridized by this method, it was found that the pattern of hybridization is reproducible from spread to spread and is observed unambiguously on greater than 90% of the chromosome spreads on a given slide.

The cloned transposable element pAC 104 is known to map at many sites along the Drosophila genome. Comparison of the autoradiograph and the fluorescent picture obtained by in situ hybridization of this probe illustrates a major advantage of this method, i.e., that where diffuse regions of silver grains appear on an autoradiograph, doublets or a series of bands are discernible by immunofluorescent labeling.

The other immediately obvious advantage of this method is the tremendous decrease in time required for gene assignments to be made by indirect immunofluorescence. An assignment of a DNA fragment to a specific band can be made within six hours of hybridization. This is in comparison to days or weeks required for autoradiographic exposure methods. This factor, in combination with increased resolution, makes the use of modified nucleotides detected by indirect immunofluorescence immediately preferable to more classical methods.

It has been shown that this immunological method also works with mammalian chromosomes wherein satellite DNA has been mapped to the centromeric regions of mouse metaphase chromosomes. The result provides a basic foundation for the development of a simple gene mapping procedure for single copy (unique) sequences in chromosomes from human and other mammals. Such a procedure should greatly facilitate our understanding of the genetic organization of the chromosome and make clinical cytogenetic diagnosis much more rapid and practical.

While a single-step "antibody sandwich" method in which the chromosome spread is challenged, post-hybridization, with rabbit anti-biotin IgG may succeed, this protocol may not generate sufficient fluorescence for unambiguous gene assignments. However, a much stronger fluorometric signal can be achieved by using the "haptene-antibody sandwich technique" described by Lamm, et al, (1972); Wofsy, et al., (1974). In this procedure the primary antibody, in our case monospecific, rabbit anti-biotin IgG, is chemically modified with a haptenization reagent, such as 2,4-dinitrofluorobenzene, preferably while the immunoglobulin is bound to an antigen affinity column (biotin-Sepharose TM). As many as 15–20 haptene (DNP) groups can be coupled to the primary antibody without decreasing its antigen binding affinity or specificity (Wallace and Wofsy, 1979). If the primary antibody treatment of the test sample is followed by an incubation with a fluorescently labeled anti-hapten IgG antibody, rather than a fluorescently labeled anti-IgG, a 5–7 fold increase in fluorescence signal can be achieved. Since one also has available monospecific guinea pig anti-DNP IgG, we can haptenize this secondary antibody with biotin and thus generate two anti-hapten IgG populations, DNP-labeled anti-biotin IgG and biotin-labeled anti-DNP IgG. If these can be used alternately to achieve several rounds of hapten -antibody sandwiching and then followed with fluorescently labeled protein A from *Staphylococcus aureus*, which binds specifically to IgG molecules from many mammalian species, it could result in an enormous amplification of the primary antibody signal with its concomitant utility.

The protein streptavidin from *Streptomyces avidini* is a potential alternative to anti-biotin IgG as a vehicle to specifically direct a coupled visualization system [e.g., fluorescent probes (above) or histochemical reagents (below)] to the site of the hybridized biotin-containing polynucleotide. One of streptavidin's advantages over anti-biotin IgG is that its affinity for biotin is $K_{assn}=10^{15}$ whereas association constants for haptene-IgG interactions are $10^7$ to $10^{10}$. The fast reaction rate and extreme affinity mean that the time required to localize the biotinized probe will be minutes with streptavidin versus hours with immunologic reagents. Initial evaluations of a streptavidin detection system are currently in progress. Polytene chromosomes hybridized

with biotinized DNA probes will be incubated with streptavidin followed by a subsequent incubation with bovine serum albumin which has been doubly labeled with biotin and FITC (FITC, biotinyl-BSA). Since only one of the four streptavidin subunits is likely to be involved in binding at each biotinized DNA site, potentially one labeled BSA molecule can bind to each of the remaining three nonconjugated subunits of the streptavidin-biotinyl nucleotide complex. The fluorescence signal from this single streptavidin+FITC, biotinyl-BSA layer will be compared with a control using the basic "antibody sandwich method" described earlier.

If the "antibody sandwich" and streptavidin+FITC, biotinyl-BSA detection intensities are comparable, one can attempt to enhance the streptavidin+FITC, biotinyl-BSA system to single-copy copy sensitivity in a manner that parallels the multiple "haptene-antibody sandwich" approach. Since some of biotin groups on BSA will not be bound to the first layer of streptavidin, a second layer of streptavidin can be added until sufficient signal is obtained. For example, if in the second layer, only two streptavidin promoters bind to each first-layer BSA and each of these streptavidin protomers binds three FITC-biotinyl BSA molecules, then the second layer intensity will be twice as great as that from the first layer; for the third layer, with analogous binding stoichiometries, the fluorescent intensity will be 12-fold that of the first layer, so the total intensity will rapidly increase with successively added layers. There are plans to use a larger carrier protein such as thyroglobulin rather than BSA in order to maximize amounts of attached fluorescent and biotin probes. It may also be necessary to use a longer linker arm between the biotin probe and the carrier protein. A longer linker arm should sterically optimize the theoretical delivery of a biotinized fluorescent carrier molecule to each nonconjugated streptavidin subunit and maximize the number of streptavidin protomers in the subsequent layer which will bind to the biotinized fluorescent carrier. As before, appropriate controls will be done to insure that substitution of the carrier protein with fluorescent probes and biotin does not cause solubility and/or nonspecific binding problems.

The streptavidin-carrier protein delivery system has two significant advantages over the immunfluorescent approach in addition to its speed of delivery. First, only two protein components are needed to form the layers. Second, only the carrier protein needs to be modified and it is not necessary to maintain functional or even total structural integrity as long as the biotin groups are accessible to streptavidin.

An alternative to the fluorescence method for visualizing hybridized probes is to direct enzymes such as peroxidase, alkaline phosphatase of $\beta$-galactosidase to the hybridization site where enzymatic conversion of soluble substrates to insoluble colored precipitates permits light microscope visualization. The important advantage of this technique is that the histochemical methods are 10 to 100-fold more sensitive than fluorescence detection. In addition, the colored precipitates do not bleach with extensive light exposure thus avoiding one of the general disadvantages of fluorescent light microscopy. These enzymes can be coupled to the final antibody instead of fluorescent probes in the "haptene-antibody sandwich" technique using bifunctional reagents such as glutaraldehyde or in the case of peroxidase via oxidation of the peroxidase carbohydrate moieties to aldehydes and coupling of these residues with $\epsilon$-amino groups of the desired protein. For the streptavidin-biotinized carrier protein method, an enzyme with biotinyl groups coupled to it could replace a fluorescently-biotinized carrier system. Alternately, the enzyme could be coupled via biotin to the last layer of streptavidin with amplification of streptavidin sites being built up in preceding layers using biotinized BSA or thyroglobulin. We will begin developing the necessary histochemical reagents and the appropriate substrate/insoluble product combinations for visualizing in situ hybridizations without background problems in the near future. The histochemical approaches to signal amplification should therefore be ready for trial in the summer of 1981.

Detecting and/or imaging very low levels of fluorescent light is possible using currently available image intensifiers or systems composed of lasers and photomultipliers. These methods permit the detection of light down to the level of individual photons. With suitable digital processing systems, images can be produced in which each point, i.e. each pixel, of the image is strictly proportional to the number of photons emitted by a point at the object. Using systems of this kind or flow systems in which the cells or parts of cells flow past a laser beam, one can obtain detection sensitivity increases for fluorescent material of factors between 100 and 1000 beyond that which can be detected by the eye. This increase is sufficient to detect the fluorescence of single copy genes.

In a preferred modification, analogs of dUTP and UTP that contain a biotin molecule covalently bound to the C-5 position of the pyrimidine ring through an allylamine linker arm have been synthesized. These biotinyl-nucleotides are efficient substrates for a variety of DNA and RNA polymerases in vitro. DNA containing low levels of biotin substitution (50 molecules or less/kilobase) has denaturation, reassociation and hybridization characteristics which are indistinguishable from that of unsubstituted control DNA.

Thus, this invention also provides a method of chromosomal karyotyping. In this method, modified polynucleotides are prepared which correspond to known genes and include modified nucleotides. These polynucleotides are hybridized with chromosomal deoxyribonucleic acid and the resulting duplexes contacted with appropriate polypeptides under suitable conditions to permit complex formation. The polypeptides include detectable moieties so that the location of the complexes can be determined and the location of specific genes thereby fixed.

Another embodiment of this invention involves detection of poly A-containing sequences using poly U in which some of the uracil bases have been modified to contain a probe. Yet another embodiment involves cyclic modified nucleotides in which two of x, y, and z are reacted to form the cyclic moiety



Such cyclic modified nucleotides may then be used to identify hormone receptor sites on cell surfaces which in turn can be used as a method of detecting cancer or tumor cells.

Finally, tumor cells can be diagnosed by preparing polynucleotides which are modified according to this invention and are complementary to the messenger ribonucleic acid synthesized from a deoxyribonucleic acid gene sequence associated with the production of polypeptides, such as α-fetal protein or carcinoembryonic antigen, the presence of which is diagnostic for specific tumor cells. Hybridization and detection of hybrid duplexes thus would provide a method for detecting the tumor cells.

The examples which follow are set forth to illustrate various aspects of the present invention but are not intended to limit in any way its scope as more particularly set forth in the claims.

## EXAMPLE 1 and 2

### Synthesis of biotinyl-UTP and biotinyl-dUTP

a) Preparation of Mercurated Nucleotides

UTP (570 mg, 1.0 mmole) or dUTP 554 mg, 1.0 mmole) was dissolved in 100 ml of 0.1M soctium acetate buffer pH 6.0, and mercuric acetate (1.59 gm, 5.0 mmoles) added. The solution was heated at 50° C. for 4 hours, then cooled on ice. Lithium chloride (392 mg, 9.0 mmoles) was added and the solution extracted six times with an equal volume of ethyl acetate to remove excess $HgCl_2$. The efficiency of the extraction process was monitored by estimating the mercuric ion concentration in the organic 0layer using 4,4'-bis(dimethylamino)-thiobenzophenone (A. N. Christoper, Analyst, 94, 392 (1969). The extent of nucleotide mercuration, determined spectrophotometrically following iodination of an aliquot of the aqueous solution as described by Dale et al. (R. M. K. Dale, D. C. Ward, D. C. Livingston, and E. Martin, Nucleic Acid Res. 2, 915 [1975]), was routinely between 90 and 100%. The nucleotide products in the aqueous layer, which often became cloudy during the ethyl acetate extraction, were precipitated by the addition of three volumes of icecold ethanol and collected by centrifugation. The precipitate was washed twice with cold absolute ethanol, once with ethyl ether, and then air dried. These thus prepared mercurated nucleotides were used for the synthesis of the allylamine-nucleotides without further purification.

b) Synthesis of allylamine-dUTP and allylamine-UTP

The mercurated nucleotides (of step a) were dissolved in 0.1M sodium acetate buffer at pH 5.0, and adjusted to a concentration of 20 mM (200 0D/ml at 267 nm). A fresh 2.0 M solution of allylamine acetate in aqueous acetic acid was prepared by slowly adding 1.5 ml of allylamine (13.3 mmoles) to 8.5 ml of ice-cold 4M acetic acid. Three ml (6.0 mmoles) of the neutralized allylamine stock was added to 25 ml (0.5 mmole) of nucleotide solution. One nucleotide equivalent of $K_2PdCl_4$, (163 mg, 0.5 mmole), dissolved in 4 ml of water, was then added to initiate the reaction. Upon addition of the palladium salt (Alfa-Ventron) the solution gradually turned black with metal (Hg and Pd) deposits appearing on the walls of the reaction vessel. After standing at room temperature for 18–24 hours, the reaction mixture was passed through a 0.45 mm membrane filter (nalgene) to remove most of the remaining metal precipitate. The yellow filtrate was diluted five-fold and applied to a 100 ml column of DEAE-Sephadex TM A-25 (Pharmacia). After washing with one column volume of 0.1M sodium acetate buffer at pH 5.0, the products were eluted using a one liter linear gradient (0.1–0.6M) of either sodium acetate at pH ~ 8–9, or triethylammonium bicarbonate (TEAB) at pH 7.5. The desired product was in the major UV-absorbing portion which eluted between 0.30 and 0.35M salt. Spectral analysis showed that this peak contained several products, final purification was achieved by reverse phase-HPLC chromatography on columns of Partisil-ODS2, using either 0.5M $NH_4H_2PO_4$ buffer at pH 3.3 (analytical separations), or 0.5M triethylammonium acetate at pH 4.3 (preparative separations) as eluents. The 5'-triphosphates of 5-(3-aminopropen-1-yl) uridine (the allylamine adduct to uridine) were the last portions to be eluted from the HPLC column and they were clearly resolved from three, as yet uncharacterized, contaminants. These nucleotides were characterized by proton NMR elemental analysis tAA-dUTP ($C_{12}H_{16}N_3O_{14}P_3Na_4.1H_2O$):-theory C, 22.91; H, 2.88; N, 6.68; P, 14.77. Found, C, 23.10; H, 2.85; N, 6.49; P, 14.75. **AA-UTP** ($C_{12}H_{16}N_3O_{15}P_3Na_4.4H_2O$): Theory, C 20.61; H, 3.46; N, 6.01; P, 13.3. Found C, 20.67; H, 4.11; N, 5.39; P, 13.54] spectrally land chromatographically.

c) Biotination of AA-dUTP or AA-UTP

Biotinyl-N-hydroxysuccinimide ester (NHSB) was prepared from biotin (Sigma) as described previously (H. Heitzmann and F. M. Richards, Proc. Natl. Acad. Sci. USA. 71, 3537 [1974]). AA-dUTP-$H_2O$ (63 mg, 0.1 mmole) or AA-UTP-.$4H_2O$ (70 mg, 0.1 mmole) was dissolved in 20 ml of 0.1M sodium borate buffer at pH 8.5, and NHSB (34.1 mg, 0.1 mmole) dissolved in 2 ml of dimethyl formamide, was added. The reaction mixture was left at room temperature for four hours and then loaded directly onto a 30 ml column of DEAE-Sephadex TM A-25, preequilibrated with 0.1M TEAB at pH 7.5. The column was eluted with a 400 ml linear gradient (0.1–0.9M) of TEAB. Fractions containing biotinyl-dUTP or biotinyl-UTP, which eluted between 0.55 and 0.65M TEAB, were desalted by rotary evaporation in the presense of methanol and redissolved in water. Occasionally a slightly cloudy solution was obtained: this turbidity, due to a contaminant in some TEAB solutions, was removed by filtration through a 0.45 mm filter. For long term storage, the nucleotides were converted to the sodium salt by briefly stirring the solution in the presence of Dowex TM 50 ($Na^+$ form). After filtration the nucleotide was precipitated by the addition of three volumes of cold ethanol, washed with ethyl ether, dried in vacuo over sodium hydroxide pellets, and stored in a dessicator at −20° C. For immediate use, the nucleotide solution was made 20 mM in Tris-HCl at pH 7.5, and adjusted to a final nucleotide concentration of 5 mM. Stock solutions were stored frozen at −20° C.

Elemental analysis of the bio-dUTP and bio-UTP products yielded the following results, Bio-dUTP ($C_{22}H_{30}N_5O_{18}P_3S_1Na_4.1H_2O$). Theoretical; C, 29.80; H, 3.38; N, 7.89; P, 10.47; S. 3.61. Found; C, 30.14 H, 3.22; N, 7.63; P, 10.31; S, 3.70. Bio-UTP ($C_{22}H_{30}N_5O_{19}P_3S_1Na_4.3H_2O$): Theoretical; C, 29.15; H, 3.19; N, 7.45; P, 9.89; S, 3.41. Found; C, 28.76; H, 3.35; N, 7.68; P, 9.81; S, 3.32.

The spectral properties of bio-dUTP and bio-UTP at pH 7.5 [λ max, 289 nm (ε=7,100); λ max, 240 nm (ε=10,700); λ min, 262 nm (ε=4,300)] reflect the presence of an exocylic double-bond in conjugation with the pyrimidine ring. These nucleotides also give a strong positive reaction (an orange-red color) when treated with p-dimethylaminocinnamaldehyde in ethanolic sulfuric acid, a procedure used for biotin quantita-

tion (D. B. McCormick and J. A. Roth, Anal. Biochem., 34,326, 1970). However, they no longer react with ninhydrin, a characteristic reaction of the AA-dUTP and AA-UTP starting materials.

## EXAMPLES 3 and 4

### Synthesis of biotinyl-CTP and biotinyl-dCTP

CTP and dCTP were a) mercurated, b) reacted with allylamine, and c) biotinized with NHS-biotin, essentially as described in Example 1. CTP (56.3 mg, 0.1 mmole) or dCTP (59.1 mg, 0.1 mmole) were dissolved in 20 ml of 0.1M sodium acetate buffer at pH 5.0, and mercuric acetate (0.159 gm, 0.5 mmoles) added. The solution was heated at 50° C. for 4.5 hours then cooled on ice. Lithium chloride (39.2 mg, 0.9 mmoles) was added and the solution extracted 6 times with ethyl acetate. The nucleotide products in the aqueous layer were precipitated by the addition of three volumes of cold ethanol and the precipitate collected by centrifugation. The precipitate was washed with absolute ethanol, ethyl ether, and then air dried. These products were used without further purification for the synthesis of AA-CTP and AA-dCTP, respectively. The mercurated nucleotides were dissolved in 0.1M sodium acetate buffer at pH 5.0 and adjusted to a concentration of 10 mM (92 OD/ml at 275 nm). 0.6 ml (1.2 mmole) of a 2.0M allylamine acetate stock (prepared as described in Example 1) was added to 10 ml of nucleotide solution (0.1 mmole) followed by the addition of $K_2PdCl_4$ (32.6 mg, 0.1 mmole), dissolved in 1.0 ml of $H_2O$. After standing at room temperature for 24 hours, the solution was filtered through a 0.45 mM membrane to remove metal precipates. The filtrate was diluted fivefold and loaded onto a 50 ml-column of DEAE-sephadex A-25, preequilibrated with 50 mM TEAB at pH 7.5. The nucleotide products were fractionated by application of a 500 ml linear gradient (0.05–0.6M) of TEAB at pH 7.5. The desired product was in the major UV absorbing portion which eluted between 0.28 and 0.38M salt. The pooled samples were desalted by rotary evaporation, dissolved in 0.5M triethylammonium acetate at pH 4.2, and final purification achieved by HPLC chromatography on columns of Partisil ODS-2, using 0.5M triethylammonium acetate as the eluent. Appropriate fractions were pooled, lyophilized, and the products dissolved in $H_2O$. The nucleotides were converted to the $Na^+$ salt by stirring briefly in the presence of Dowex TM 50 ($Na^+$ form). After filtration, to remove the Dowex resin, the nucleotides were precipitated by the addition of 3 volumes of cold ethanol. The precipitate was washed with ether and then air dried. Analytical, results: AA-dCTP ($C_{12}H_{17}N_4O_{13}P_3Na_4.2\ H_2O$); Theory, C, 22.29; H, 2.63; N, 8.67, P, 14.40. Found C, 22.16; H. 2.89; N. 8.77; P, 14.18. AA-CTP ($C_{12}\ H_{17}\ N_4\ O_{14}\ Na_4.2H_2O$); Theory C, 21.75; H, 2.57; N, 8.46; P, 14.01. Found, C, 22.03; H, 2.47; N, 8.69; P, 13.81; Spectral properties in 0.1M Borate buffer at PH 8.0, $\lambda$ max 301 nm ($\epsilon$=6,400), $\lambda$ min 271 nm ($\epsilon$=3,950) $\lambda$ max 250 nm ($\epsilon$=9,700). Both AA-dCTP and AA-CTP give a positive ninhydrin test. AA-CTP (6.6 mg, 0.01 mmole) or AA-dCTP (6.4 mg, 0.01 mmole) was dissolved in 5 ml of 0.1M sodium borate buffer at pH 8.5, and NHS-biotin (3.4 mg, 0.01 mmole), dissolved in 0.2 ml of dimethylformamide, was added. After sitting at room temperature for 4 hours the sample was chromatographed on a 10 ml column of DEAE-Sephadex A-25, using a 150 ml linear gradient (0.1–0.9M) of TEAB at pH 7.5, as eluent. Fractions containing biotinyl-CTP or biotinyl-dCTP, which eluted between 0.50 and 0.60M TEAB, were pooled, desalted by rotary evaporation, and after being adjusted to a final concentration of 5 mM in 0.0M Tris-HCl buffer at pH 7.5, were frozen at −20° C. The products give a strong positive reaction for biotin with p-dimethylaminocinnamldehyde in ethanolic sulfuric acid but give a negative test for primary amines when sprayed with ninhydrin. Further structural characterization of these products is in progress.

## EXAMPLES 5 and 6

### Synthesis of Iminobiotinyl-UTP and Iminobiotinyl-dUTP

Iminobiotin hydrobromide was prepared from biotin as described previously (K. Hofmann, D. B. Melville and V. du Vigneaud, J. Biol. Chem., 141, 207–211, 1941; K. Hofmann and A. E. Axelrod, Ibid., 187., 29–33, 1950). The N-hydroxysuccinimide (NHS) ester of iminobiotin was prepared using the protocol previously described for the synthesis of NHS-Biotin (H. Heitzmann and F. M. Richards, Proc. Nat. Acad. Sci. USA, 71, 5537, 1974). AA-UTP (7.0 mg, 0.01 mmole) or AA-dUTP (6.3 mg, 0.01 mmole), prepared as detailed in example 1 (part b), was dissolved in 5 ml of 0.1M sodium borate buffer at pH 8.5, and NHS-iminobiotin (3.5 mg, 0.01 mmole), dissolved in 0.5 ml of dimethylformamide, was added. The reaction mixture was left at room temperature for 12 hours and then loaded directly onto a 10 ml column of DEAE-Sephadex A-25, preequilibrated with 0.05M TEAB at pH 7.5. The column was eluted with a 150 ml linear gradient (0.05–0.6M) of TEAB. Fractions containing iminobiotin-UTP or iminobiotin-dUTP, which eluted between 0.35 and 0.40M TEAB, were desalted by rotary evaporation in the presence of methanol and dissolved in $H_2O$. The products contained a small amount of allylamine-nucleotide adduct as an impurity, as judged by a weak positive result in the ninhydrin test. Final purification was achieved by affinity chromatography on avidinsepharose. Fractions of the impure product, made 0.1M in sodium borate buffer at pH 8.5, were applied to a 5 ml column of avidin-sepharose and washed with 25 ml of the same buffer. The column was then washed with 50 mM ammonium acetate buffer at pH 4.0, which eluted the desired iminobiotin-nucleotide product in a sharp peak. The nucleotide was precipitated by the addition of 3 volumes of cold ethanol, washed with ethylether, dried in vacuo over sodium hydroxide pellets and stored in a dessicator at −20° C. Products were characterized by elemental analysis, as well as by spectral and chromotographic properties.

## EXAMPLES 7 and 8

### Synthesis of NAGE-UTP and NAGE-dUTP

Allyl (3-amino-2-hydroxy-)propyl ether, abbreviated MAGE, was prepared from allyl glycidyl ether (Age) (obtained from Aldrich Chemical Co.). 10 ml of Age (84 mmole) was added slowly (in a fume hood) to 50 ml of 9M ammonium hydroxide and the mixture allowed to stand at room temperature for six hours. Excess ammonia was removed by rotary evaporation under reduced pressure to yield a viscous yellow oil. Analysis of this product by proton NMR showed that it possessed the required structure. 5-mercuri-dUTP (0.1 mmole) or 5-mercuri-UTP (0.2 mmole) was dissolved in 2–4 ml of 0.2M sodium acetate buffer at pH 5.0, and a 16 fold

molar excess of NAGE adjusted to pH 5.0 with acetic acid prior to use, was added. The final reaction volumes (4.3 and 8.4 ml) had nucleotide concentrations of 43 and 42 mM, respectively. One equivalent of $K_2PdCl_4$ (0.1 or 0.2 mmoles) was added to initiate the reaction. After standing at room temperature for 18 hours, the reaction mixtures were filtered through 0.45 μmM membranes the samples diluted five-fold, and chromatographed on columns of DEAE-Sephadex A-25, using linear gradients (0.1–0.6M) of sodium acetate. Fractions containing the desired products, as judged by their UV spectra and characteristic HPLC elution profiles on Partisil ODS-2, were pooled, diluted, and further purified by rechromatography on DEAE-Sephadex using shallow gradients (0.1–0.5M) of ammonium bicarbonate at pH 8.5. Under these conditions the majority of the NAGE-dUTP (or NAGE-UTP)could be cleanly separated from residual impurities. Proton NMR spectra were obtained at this stage of purification after the nucleotides were lyophilized and redissolved in $D_2O$. For elemental analysis, the products were converted to their sodium salt form. Typical analytical results: Nage-dUTP ($C_{15}H_{22}N_3O_{16}P_3Na_4.2H_2O$), Theory, C, 24.99; H, 3.63; N, 5.83; P, 12.88. Found, C, 25.39; H, 3.71; N, 5.63; P, 12.88

## EXAMPLE 9

### Uses of Labeled DNA Sequences

I. Karyotyping

(a) Select from a human gene library some 100 to 200 clones. Label them as described above, and for each clone locate its place or places of hybridization visually or with a low-light-level video system. For those clones which correspond to a unique sequence gene this determines the location of the cloned DNA on a particular human chromosome. Obtain several clones for each chromosome. Each of these labeled clones can be used to identify particular chromosomes. They can also be used in combination to identify each of the 46 chromosomes as being one of the 22 autosomal pairs or the X or the Y. By allowing one set of labeled clones to hybridize to the chromosomes and then adding a fluorescent stain to the label, the set of clones and their locations can be visualized and will fluoresce with a particular color. A second set of labeled clones could then be used and reacted with a second fluorescent dye. The same process can be repeated a number of times. Thus one can, if desired, have several sets of fluorescent labels attached to the cellular DNA at different but specific locations on each of the chromosomes. These labels could be used for visual or computerized automatic karyotyping.

(b) For automatic karyotyping, one could use one set of clones to identify the approximate location of each of the 46 chromosomes by finding sets of spots corresponding to the number of labeling sites on each chromosome. Thus, it is possible by computer analysis of the digitized images to determine if the chromosomes are suitably spread for further analysis. If they are suitably spread, then one can use computer analysis to identify each of the individual chromosomes by the location and distribution of the labelled spots on each one.

By using the fact that the fluorescent spots can be placed at specific locations on each chromosome, one can carry out either manual or automatic karyotyping very much more effectively than without such labels.

II. Diagnosis of Genetic Disorders

By selecting the clones which bind specifically to a particular chromosome, such as number 23, it is possible to count the number of copies of the particular chromosome in a cell even if the chromosomes are not condensed at metaphase. Thus when fetal cells are obtained for prenatal diagnosis of trisomy 21, the diagnosis can be done even if the chromosomes are not condensed at metaphase. If necessary, two sets of labels can be used—one which would be specific for chromosome 23 and one for some other chromosome. By measuring in each cell the ratio of the two labels, which might be of different colors, it is possible to identify the cells which show an abnormal number of chromosomes number 23. This procedure could be used either on slides with a low-light-level video system or in a flow cytometer system using laser excitation. It can be used to determine any abnormal chromosome number.

III. Microorganism Detection and Identification

The labeling of specific sequences of DNA as described above permits identification and counting of individual bacteria. In order to identify the individual bacteria to which a particular fragment of DNA hybridizes the sensitivity must Le such that a single labelled structure can be detected. This can be done using a low-light-level video system and computer summation of images, or by using some other device for intensifying the light image. A flow system can also be used if the sensitivity can be made sufficiently grand. If one immobilized the bacteria on a slide their location could be found and the number of such fluorescent spots counted. This would provide a count of all of those bacteria which contain DNA which can hybridize with the specific clone utilized. If the clone is selected as being specific for a particular strain or bacteria, then one can count the number of organisms of that strain. In addition,any antibiotic resistance for which a particular gene has been identified could be characterized in a similar way using, as a probe, the DNA sequence which is contained in the antibiotic resistance gene. In addition,a probe could be used which is specific for a resistance plasmid containing one or more antibiotic resistance genes. In addition to individual bacteria, groups of bacterial cells of a particular strain can be detected and their number estimated if they are located in a small spot so that the total fluorescence specific to the hybridized DNA in the spot can be measured. In this way the number of organisms containing a specific DNA sequence can be measured in a mixture of bacteria.

We claim:

1. An oligo- or polynucleotide containing a nucleotide having the structure:




wherein B represents a 7-deazapurine or a pyrimidine moiety covalently bonded to the $C^{1'}$-position of the sugar moiety, provided that whenever B is a 7-deazapurine, the sugar moiety is attached at the $N^9$-position of the 7-deazapurine, and whenever B is a pyrimidine, the sugar moiety is attached at the $N^1$-position of the pyrimidine;

wherein A comprises at least three carbon atoms and represents at least one component of a signaling moiety capable of producing a detectable signal;

wherein B and A are covalently attached directly or through a linkage group that does not substantially interfere with the characteristic ability of the oligo- or polynucleotide to hybridize with a nucleic acid and does not substantially interfere with formation of the signalling moiety or detection of the detectable signal, provided also that if B is 7-deazapurine, A or the linkage group is attached to the 7-position of the deazapurine, and if B is pyrimidine, A or the linkage group is attached to the 5-position of the pyrimidine;

wherein one of x and y represents

$$-O-\overset{O}{\overset{\|}{\underset{OH}{\underset{|}{P}}}}-O- \quad \text{or} \quad -O\overset{O}{\overset{\|}{\underset{O^-}{\underset{|}{P}}}}-O-$$

and the other of x and y is absent or represents —OH or —H; and

wherein z represents H— or HO—.

2. An oligo- or polynucleotide of claim 1 wherein B is selected from the group consisting of uracil, cytosine, deazaadenine, and deazaguanine.

3. An oligo- or polynucleotide of claim 1 wherein A is a ligand.

4. An oligo- or polynucleotide of claim 1 wherein A is a hapten.

5. An oligo- or polynucleotide of claim 4 wherein A is biotin.

6. An oligo- or polynucleotide of claim 4 wherein A is iminobiotin.

7. An oligo- or polynucleotide of claim 1 wherein the linkage group includes an olefinic bond at the $\alpha$-position relative to B.

8. An oligo- or polynucleotide of claim 1 wherein the linkage group includes the moiety $—CH_2—NH—$.

9. An oligo- or polynucleotide of claim 7 wherein the olefinic linkage group is the moiety $—CH{=}CH—CH_2—NH—$.

10. An oligo- or polynucleotide of claim 7 wherein the wherein the olefinic linkage group is

$$—CH{=}CH—CH_2—O—CH_2—\underset{OH}{\underset{|}{C}H}—CH_2—NH—.$$

11. An oligo- or polynucleotide of claim 1 wherein A is an organic moiety containing at least five carbon atoms.

12. An oligo- or polynucleotide of claim 1 wherein z is HO—.

13. An oligo- or polynucleotide of claim 1 wherein z is H—.

14. An oligo- or polynucleotide of claim 11 wherein A is biotin.

15. An oligo- or polynucleotide of claim 11 wherein A is iminobiotin.

16. An oligo- or polynucleotide of claims 14 or 15 wherein the linkage group is $—CH{=}CH—CH_2—NH—$.

17. An oligo- or polynucleotide of claim 14 or 15 wherein the linkage group is

$$—CH{=}CH—CH_2—O—CH_2—\underset{OH}{\underset{|}{C}H}—CH_2—NH—.$$



18. An oligo- or polynucleotide of claim 14 or 15 wherein B is uracil.

19. A method of making the oligo- or polynucleotide of claim 1 comprising the steps of:

(a) reacting an oligo- or polynucleotide containing a nucleotide having the structure:




with a mercuric salt in a suitable solvent under suitable conditions so as to form a mercurated derivative compound having the structure:




(b) reacting said mercurated derivative compound with a chemical moiety reactive with the —Hg+ portion of said mercurated compound and represented by the formula . . . N, said reaction being carried out in an aqueous solvent and in the presence of a palladium-containing compound under suitable conditions so as to form a compoundd having the structure:




wherein N is a reactive terminal functional group or is A; and

(c) when N is A, recovering said oligo- or polynucleotide of claim 1; or when N is a reactive terminal group, reacting said compound with a compound having the structure M—A wherein M represents a functional group reactive with N in an aqueous solvent under suitable conditions so as to form said oligo- or polynucleotide of claim 1 and recovering said oligo- or polynucleotide.

20. A method in accordance with claim 19 wherein said suitable conditions comprise a pH in the range from about 4 to 8, a temperature in the range from about 20° C. to 30° C., and a reaction time in the range from about 3 to 24 hours.

21. A method in accordance with claim 19 wherein said mercuric salt is mercuric acetate.

22. A method in accordance with claim 19 wherein said chemical moiety represented by the formula . . . N is

$$—CH{=}CH—CH_2—NH_2.$$

23. A method in accordance with claim 19 wherein said chemical moiety represented by the formula . . . N is

$$-CH{=}CH-CH_2-O-CH_2-\underset{\textstyle OH}{\underset{|}{CH}}-CH_2-NH_2.$$

24. A method in accordance with claim 19 wherein said aqueous solvents include a buffer.

25. A method in accordance with claim 24 wherein said buffer is selected from the group consisting of sodium acetate, potassium acetate, sodium citrate, potassium citrate, potassium citrate-phosphate, tris-acetate, and borate-sodium hydroxide.

26. A method in accordance with claim 25 wherein the concentration of said buffer is less than about 2.0 molar.

27. A method in accordance with claim 19 wherein in step (b) the aqueous solvent additionally includes an organic solvent.

28. A method in accordance with claim 27 wherein said organic solvent is water-miscible.

29. A method in accordance with claim 27 wherein said organic solvent is selected from the group consisting of alcohols, ketones, and amides.

30. A method in accordance with claim 29 wherein said organic solvent is selected from the group consisting of methanol, ethanol, propanol, glycerin, dioxane, acetone, pyridine, and dimethylformamide.

31. A method in accordance with claim 29 wherein A comprises biotin or iminibiotin, and M is selected from the group consisting of N-hydroxy-succinimide ester, imidate, anhydride, isothiocyanate, and epoxide.

32. A method in accordance with claim 19 wherein M is an N-hydroxysuccinimide ester.

33. A method in accordance with claim 19 wherein M is selected from the group consisting of imidate, anhydride, isothiocyanate, and epoxide.

34. A method in accordance with claim 19 wherein . . . N is selected from the group consisting of thiol, carboxylic acid, epoxide, and amine.

35. A method in accordance with claim 19 wherein said chemical moiety represented by the formula . . . N is

$$-CH{=}CH-CH_2-NH\text{-biotin.}$$

36. A method in accordance with claim 19 wherein said chemical moiety represented by the formula . . . N is

$$-CH{=}CH-CH_2-O-CH_2-\underset{\textstyle OH}{\underset{|}{CH}}-CH_2-NH\text{-biotin.}$$

37. A method in accordance with claim 19 wherein said chemical moiety represented by the formula . . . N is

$$-CH{=}CH-CH_2-NH\text{-iminobiotin.}$$

38. A method in accordance with claim 19 wherein said chemical moiety represented by the formula . . . N is

$$-CH{=}CH-CH_2-O-CH_2-\underset{\textstyle OH}{\underset{|}{CH}}-CH_2-NH\text{-iminobiotin.}$$

39. A double-stranded polynucleotide duplex which includes the oligo- or polynucleotide of claim 1.

40. The duplex of claim 39 wherein said polynucleotide strands are ribonucleic acid molecules.

41. The duplex of claim 39 wherein said polynucleotide strands are deoxyribonucleic acid molecules.

42. An oligo- or polynucleotide sequence comprising at least one of a moiety having the structure:

—BA

wherein B represents a 7-deazapurine or a pyrimidine moiety suitable for incorporation into a polynucleotide and;

wherein A comprises at least three carbon atoms and represents at least one component of a signalling moiety capable of producing a detectable signal;

wherein B and A are covalently attached directly or through a linkage group that does not substantially interfere with the characteristic ability of the sequence to hybridize with a nucleic acid and does not substantially interfere with formation of the signalling moiety or detection of the detectable signal, provided also that if B is 7-deazapurine, A or the linkage group is attached to the 7-position of the deazapurine, and if B is pyrimidine, A or the linkage group is attached to the 5-position of the pyrimidine.

43. An oligo- or polynucleotide sequence of claim 42 wherein A is a ligand.

44. An oligo- or polynucleotide sequence of claim 42 wherein A is a polypeptide.

45. An oligo- or polynucleotide sequence wherein A is fluorescent, electron dense, or is an enzyme capable of reacting with a substrate to form a detectable reaction product.

46. An oligo- or polynucleotide sequence of claim 42 wherein A is a moiety consisting of at least five carbon atoms.

47. An oligo- or polynucleotide sequence of claim 42 wherein B is a pyrimidine.

48. An oligo- or polynucleotide containing therein a sugar moiety having the structure:




wherein B represents a 7-deazapurine or a pyrimidine moiety covalently bonded to the $C^{1'}$-position of the sugar moiety, provided that whenever B is a 7-deazapurine, the sugar moiety is attached at the $N^9$-position of the 7-deazapurine, and whenever B is a pyrimidin, the sugar moiety is attached at the $N^1$-position of the pyrimidine;

wherein A comprises at least three carbon atoms and represents at least one component of a signalling moiety capable of producing a detectable signal; and

wherein B and A are covalently attached directly or through a linkage group that does not substantially interfere with the characteristic ability of the oligo- or polynucleotide to hybridize with a nucleic acid and does not substantially interfere with formation of the signalling moiety or detection of the detectable signal, provided also that if B is 7-deazapurine, A or the linkage group is attached to the 7-position of the deazapurine, and if B is pyrimidine, A or the linkage group is attached to the 5-position of the pyrimidine.

**49**. An oligo- or polynucleotide of claim **48**, wherein the sugar moiety has attached to its $C^{3'}$-position a member selected from the group consisting of:



**50**. An oligo- or polynucleotide of claim **48**, wherein the sugar moiety has attached to its $C^{5'}$-position a member selected from the group consisting of:



**51**. An oligo- or polynucleotide of claim **48**, wherein the sugar moiety has attached to its $C^{2'}$-position a H— or HO— group.

**52**. A method in accordance with claim **19**, wherein the palladium-containing compound is $K_2PdCl_4$.

**53**. An oligo- or polynucleotide of claim **48** wherein A is a ligand.

**54**. An oligo- or polynucleotide of claim **3** or **53** wherein the ligand is selected from the group consisting of a hapten, an antigen, a cofactor, biotin and iminobiotin.

**55**. An oligo- or polynucleotide of claim **3** or **53** wherein the ligand is selected from the group consisting of dinitrophenol, lipoic acid and an olefinic compound.

**56**. An oligo- or polynucleotide of claim **3** or **53** wherein the ligand is capable of forming a complex by binding with a detectable polypeptide.

**57**. An oligo- or polynucleotide of claim **56** wherein the detectable polypeptide is selected from the group consisting of an antibody, an enzyme, streptavidin and avidin.

**58**. An oligo- or polynucleotide of claim **56** wherein an indicator molecule is associated with or bound to the detectable polypeptide.

**59**. An oligo- or polynucleotide of claim **58** wherein the indicator molecule is fluorescent, electron dense, or an enzyme capable of depositing insoluble reaction products.

**60**. An oligo- or polynucleotide of claim **59** wherein the enzyme is selected from the group consisting of alkaline phosphatase, peroxidase and $\beta$-galactosidase.

**61**. An oligo- or polynucleotide of claim **59** wherein the fluorescent indicator molecule is selected from the group consisting of fluorescein and rhodamine.

**62**. An oligo- or polynucleotide of claim **59** wherein the electron dense indicator molecule is selected from the group consisting of ferritin, hémocyanin and colloidal gold.

**63**. An oligo- or polynucleotide of claim **58** wherein the indicator molecule is covalently linked to the detectable polypeptide.

**64**. An oligo- or polynucleotide of claim **58** wherein the detectable polypeptide is indirectly detectable by specifically complexing the detectable polypeptide with a second polypeptide covalently linked to an indicator molecule.

**65**. An oligo- or polynucleotide of claim **64** wherein said detectable polypeptide is selected form the group consisting of avidin and streptavidin and the second polypeptide is selected from the group consisting of biotin and iminobiotin.

**66**. An oligo- or polynucleotide of claim **56** wherein at least one compound is labeled with a first indicator molecule and at least one other compound is labeled with a second indicator molecule.

**67**. An oligo- or polynucleotide of claim **1** or **48** wherein A comprises an indicator molecule.

**68**. An oligo- or polynucleotide of claim **67** wherein said indicator molecule is fluorescent, electron dense, or is an enzyme capable of depositing insoluble reaction products.

**69**. An oligo- or polynucleotide of claim **68** wherein the enzyme is selected from the group consisting of alkaline phosphatase, peroxidase and $\beta$-galactosidase.

**70**. An oligo- or polynucleotide of claim **68** wherein the fluorescent indicator molecule is selected from the group consisting of fluorescein and rhodamine.

**71**. An oligo- or polynucleotide of claim **68** wherein the electron dense compound is selected from the group consisting of ferritin, hemocyanin and colloidal gold.

* * * * *

US005449767C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10104th)

**United States Patent** (10) **Number: US 5,449,767 C1**

**Ward et al.** (45) **Certificate Issued: Apr. 9, 2014**

(54) **MODIFIED POLYNUCLEOTIDES AND METHODS OF PREPARING SAME**

(75) Inventors: **David C. Ward**, Guilford, CT (US); **Pennina R. Langer**, Monsey, NY (US); **Alexander A. Waldrop, III**, Charlottesville, VA (US)

(73) Assignee: **Kuhlman Corporation**, Troy, MI (US)

**Reexamination Request:**

No. 90/012,061, Dec. 16, 2011
No. 90/012,203, Mar. 20, 2012
No. 90/012,738, Dec. 13, 2012

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,449,767** |
| Issued: | **Sep. 12, 1995** |
| Appl. No.: | **07/886,660** |
| Filed: | **May 20, 1992** |

**Related U.S. Application Data**

(60) Continuation of application No. 07/130,002, filed on Dec. 8, 1987, now abandoned, which is a division of application No. 06/496,915, filed on May 23, 1983, now Pat. No. 4,711,955, which is a continuation-in-part of application No. 06/255,233, filed on Apr. 17, 1981, now abandoned.

(51) **Int. Cl.**

| | |
|---|---|
| ***C07H 19/00*** | (2006.01) |
| ***C07H 19/20*** | (2006.01) |
| ***C07H 21/00*** | (2006.01) |
| ***C12P 19/00*** | (2006.01) |
| ***C12P 19/34*** | (2006.01) |
| ***C12Q 1/18*** | (2006.01) |
| ***C12Q 1/68*** | (2006.01) |

(52) **U.S. Cl.**

CPC ................ ***C07H 19/20*** (2013.01); ***C07H 21/00*** (2013.01); ***C12Q 1/6816*** (2013.01); ***C12Q 1/18*** (2013.01); ***C12Q 1/6804*** (2013.01); ***C12P 19/34*** (2013.01)

USPC ...... **536/24.3**; 536/25.32; 536/25.6; 536/26.6

(58) **Field of Classification Search**

None

See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceedings for Reexamination Control Numbers 90/012,061, 90/012,203, and 90/012,738, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Gary Kunz

(57) **ABSTRACT**

Compounds having the structure:




wherein B represents 7-deazapurine, or pyrimidine moiety covalently bonded to the $C^{1'}$-position of the sugar moiety, provided that when B is 7-deazapurine, it is attached at the $N^9$-position of the 7-deazapurine and when B is pyrimidine, it is attached at the $N^1$-position;

wherein A represents a moiety consisting of at least three carbon atoms which is capable of forming a detectable complex with a polypeptide when the compound is incorporated into a double-stranded ribonucleic acid, deoxyribonucleic acid duplex, or DNA-RNA hybrid;

wherein the dotted line represents a chemical linkage joining B and A, provided that if B is 7-deazapurine, the linkage is attached to the 7-position of the deazapurine, and if B is pyrimidine, the linkage is attached to the 5-position of the pyrimidine; and

wherein each of x, y and z represents




either directly, or when incorporated into oligo- and polynucleotides, provide probes which are widely useful.

# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1**, **2**, **8**, **11**, **13**, **42**, **46-51**, **67**, **68** and **70** is confirmed.

Claims **3-7**, **9**, **10**, **12**, **14-41**, **43-45**, **52-66**, **69** and **71** were not reexamined.

* * * * *

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of July, 2016, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ L. Gene Spears
L. Gene Spears
Baker Botts L.L.P.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the limitation of Fed. R. App. P. 32(a)(7)(B). Excluding those portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), it contains 10,095 words as determined by the automated count routine of Microsoft Word. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), having been prepared in proportionally spaced typeface in 14 point Times New Roman font.

*/s/ L. Gene Spears*
L. Gene Spears
BAKER BOTTS L.L.P.